Alfred D. SCHIAFFO, Plaintiff,

v.

Henry HELSTOSKI, Defendant.

Civ. A. No. 1571–72.

United States District Court,
D. New Jersey.

Oct. 19, 1972.

Robert B. Budelman, Jr., Westwood, N. J., John J. Dudas, Jr., Hackensack, N. J., for plaintiff.

Alfred A. Porro, Jr., Lyndhurst, N. J., for defendant.

Eugene L. Dinallo, and Malcolm Blum, Hackensack, N. J., amicus curiae on Behalf of the Committee on House Admin-

istration, United States House of Representatives.

## OPINION

GARTH, District Judge:

Plaintiff Alfred Schiaffo, presently a State Senator of New Jersey and the challenger in the current election scheduled for November 7, 1972, for the seat currently held by the defendant as representative of the Ninth Congressional District, filed his complaint against defendant on September 26, 1972.

The complaint addresses itself essentially to various types of franked mailings and activities on the part of defendant sought to be enjoined by the plaintiff as in violation of the Congressional franking privilege and the Constitution. A temporary restraining order sought by the plaintiff was denied by the court by reason of disputed matters of fact and law, and within four days hearings were commenced respecting the issuance of a preliminary injunction. Both parties then agreed that the hearings when concluded would suffice as and constitute the final hearings for permanent relief. Issue as to additional materials brought to the court's attention during these hearings—which materials defendant either had mailed or intended to mail—was deemed by the Court to have been raised by the pleadings.[1]

Final argument was heard on October 10, 1972, at which time a permanent injunction was issued effective immediately against the distribution of certain materials under defendant's frank. This written opinion incorporates the substance of an oral opinion delivered from the bench on October 10.

## FINDINGS OF FACT

1. Defendant, a Democrat, has served eight years in the Congress, is in his fourth term, commenced his first term in February 1965, and is running for election to the newly reapportioned Ninth Congressional District. Plaintiff, a Republican, is presently a State Senator in the New Jersey State Senate and is his party's candidate for the defendant's Congressional seat in the November 1972 election.

2. The Ninth District consists presently of the following municipalities in Bergen County:

NINTH DISTRICT—Bergen County: That portion embracing the boroughs of Alpine, Bergenfield, Bogota, Carlstadt, Cliffside Park, Closter, Cresskill, Demarest, Dumont, East Rutherford, Edgewater, Englewood Cliffs, Fairview, Fort Lee, Haworth, Leonia, Montvale, Moonachie, New Milford, North Arlington, Northvale, Norwood, Old Tappan, Palisades Park, Ridgefield, Rockleigh, Rutherford, Tenafly, Teterboro, Wallington and Wood-Ridge, City of Englewood and Townships of Lyndhurst, Ridgefield Park, Rivervale, and Teaneck. Population (1960), 390,134; estimated to July 1969, 510,000.

Congressional Directory 108, 92d Cong., 2d Sess. (population figures). For ease in reference throughout this opinion, I shall refer to the aforesaid District as Area A.

3. On April 26, 1972, the United States District Court for the District of New Jersey, in the case of David v. Cahill, 342 F.Supp. 463 (D.N.J.1972), (three-judge court), ordered that Governor William T. Cahill and all election officials of the State of New Jersey "shall conduct the primary election on June 6, 1972 to choose candidates for membership in the House of Representatives from New Jersey, and the general election on November 7, 1972 for membership in the House of Representatives," from districts thereafter designated. The decree resulted in a redistricting of the Ninth District as well as other Congressional Districts.

4. By reason of the redistricting decree the following municipalities will be

---

1. Charges with respect to paragraph 9 of the complaint dealing with the defendant's participation in a March of Dimes solicitation were withdrawn.

included in Congressional Districts other than Area A:

Montvale
North Arlington
Wallington
Wood-Ridge
Ridgefield Park
Teaneck
Bogota

and the following municipalities will now be included in the new Ninth District:

Bergen County: Harrington Park
 Little Ferry
 Park Ridge
 River Edge
 Portion of South Hackensack [2]

Hudson County: Secaucus
 Union City
 North Bergen

The additional towns to be included in the Ninth Congressional District will be referred to as Area B.

5. With respect to the particular mailings and publications brought into issue by the complaint and hearings, I will refer to four different groups:

## GROUP 1

**A.** *The Yearbook of Agriculture 1963*

On or about June 16, 1972, after the primary election, approximately 280 copies of a Department of Agriculture Publication which is also a House Document entitled "The Yearbook of Agriculture 1963—A Place to Live" was mailed under defendant's franking privilege to specifically addressed public officials in Areas A and B. Enclosed between the cover and the first page of each Yearbook was a brief "cover" letter explaining the purpose of the book and identifying its sender as the defendant. With the exception of three or four requests, the mailing of these 280 books was unsolicited.

Defendant intends to continue distribution of various editions of this publication under his frank.

**B.** *The Capitol Symbol of Freedom*

On or about August 23, 1972, defendant mailed unsolicited and under his frank to Republican County Committee people in Areas A and B approximately 500 copies of the 1961 edition or some other edition of a magazine entitled "The Capitol Symbol of Freedom," a House Document printed by order of Congress. Defendant had made similar mailings of this magazine for the past eight years. These magazines were sent only to Republicans in 1972 because (1) the defendant had previously mailed similar publications to Democratic County Committee people, and (2) the defendant had copies of the magazine left over in his office.

Defendant's office stamped these magazines "Best Wishes Henry Helstoski, Congressman New Jersey Ninth District" and enclosed with them a "cover" letter explaining the purpose of the distribution as well as inviting the recipients of the magazine to call upon the defendant at any time they had need of other federal publications made available to him for distribution.

Defendant intends to continue mailing these publications in various editions as before.

**C.** *Consumer Product Information Index*

Some time in July or August 1972, defendant received an allotment of 50,000 copies of a publication entitled "Consumer Product Information" from the Consumer Product Information Coordinating Center of the General Services Administration (GSA). Printed by the GSA, this publication is an index of pamphlets available from the Consumer Product Information Coordinating Center.

---

2. That portion of South Hackensack included in the new Congressional District does not appear in evidence. However, I have taken judicial notice of its inclusion. David v. Cahill, 342 F.Supp. 463, 470 (D.N.J.1972).

The front cover of the Index as received from the GSA was blank, and the address side (the back cover) was also blank except for the words "Consumer Product Information—an index of selected Federal Publications on how to buy, use and take care of consumer products." On certain copies of the GSA publication defendant had printed at his own expense and by his own printer on the front cover a "Dear Friends" letter reproducing his letterhead, and on the address side, the legend "Congress of the United States, House of Representatives, Official Business, Henry Helstoski m. c., Postal Patron—Local 9th Congressional District, New Jersey". As to the rest of the 50,000 GSA publications, defendant had the front cover of the brochure stamped with the legend "Compliments of your Congressman Henry Helstoski 9th District, New Jersey" and enclosed the pamphlet in a brown envelope marked "public document" bearing his frank.

On or about September 1, 1972, defendant began an unsolicited mass mailing under his frank of these 50,000 copies to Postal Patrons in Areas A and B, and as of September 29, 1972, the 50,000 allotment had already been distributed.

### GROUP II

A. *Consumer Product Information Index Reprints*

In addition to the allotted 50,000 GSA indexes already distributed, defendant has printed or is in the process of printing 156,000 additional copies of "Consumer Product Information" at his own expense, which copies of the index are to be mailed unsolicited under defendant's frank as Postal Patron mail to Areas A and B. These additional 156,000 copies of "Consumer Product Information" have not been provided to defendant by any official allotment either from the Executive or the Congress nor has their printing been in any way officially authorized.

B. *Newsletters*

On or about September 13, 1972, defendant sent unsolicited in a mass mailing as Postal Patron mail under his frank 206,000 newsletters entitled "Washington Report" to Areas A and B. These newsletters were addressed to "Postal Patron Local, 9th Congressional District, New Jersey," and the envelopes in which they were distributed were stamped "Public Document, Official Business." Other copies of the newsletter have been sent to specific addressees outside Areas A and B.

The "Washington Report" was prepared some time prior to August 29, 1972 at defendant's own expense. Its publication was not authorized by order or resolution of Congress. Various editions of the "Washington Report" have been distributed on a regular and unsolicited basis to defendant's constituents.

Defendant intends to continue sending to Postal Patrons in Areas A and B copies of the "Washington Report" on an unsolicited basis.

C. *February or March Questionnaire*

From February through March 1972 the defendant mailed his annual legislative questionnaire to each Postal Patron in Areas A and B on an unsolicited basis under his frank. The questionnaire had been printed at defendant's own expense and not by any official Congressional or Executive authorization.

D. *Young Voter Questionnaire*

In or about August 1972 defendant mailed under his frank to 15,000 specifically addressed young voters and/or graduating students in Areas A and B a "Young Voter Opinion Survey." This questionnaire was printed at defendant's own expense and was unsolicited.

E. *Drug Brochure*

Defendant intends to mail unsolicited under his frank 206,000 copies of a brochure on the drug problem which will be prepared by private individuals and printed at defendant's expense. The

mailing will be sent to Postal Patrons in Areas A and B.

## GROUP III

A. *Results of February or March Questionnaire*

Shortly after June 28, 1972, the defendant mailed unsolicited to Postal Patrons in Areas A and B under his frank 206,000 copies of the results of the February or March questionnaire. These results had been printed in the Congressional Record of Wednesday, June 28, 1972, and reprinted for distribution at defendant's own expense.

B. *Declaration of Independence*

Defendant intends to mail unsolicited under his frank 5,000 copies of the Declaration of Independence prepared on parchment for framing purposes together with a statement inserted in the Congressional Record by defendant in the early part of September 1972, both of which have been printed at defendant's own expense. This mailing will be sent to Republican and Democratic County Committee people, officials, schools and libraries in Areas A and B with a letter indicating that more copies will be available upon request.

## GROUP IV

A. *Revenue Sharing Report*

Defendant has mailed unsolicited 280 copies of a report on Revenue Sharing printed at his own expense to public officials in Areas A and B and will mail unsolicited six or seven hundred updated versions of these mimeographed reports to state and local officials in Areas A and B. These reports have been and will be mailed under the defendant's frank.

B. *Gun Control Survey*

Defendant intends to send an unsolicited survey on gun control under his frank to forty police chiefs in Areas A and B. These surveys will be printed at defendant's own expense.

6. *General Findings.* As a result of advisory opinions issued by Congressional Committees and previously by the Post Office Department, defendant had reasonable cause to believe that all his mailings under discussion to date and all his intended mailings would be permitted under his frank. The materials distributed by defendant under his frank cannot be characterized as the type of electioneering aids which were found in Rising v. Brown, 313 F.Supp. 824 (C.D. Cal.1970).

I

## JURISDICTION

■ Although not asserted in the complaint as a jurisdictional basis, jurisdiction with respect to a claim that the franking privilege has been violated rests with this court by virtue of 28 U.S.C. § 1339 which provides:

"The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."

*See* Christian Beacon v. United States, 322 F.2d 512 (3d Cir. 1963); Straus v. Gilbert, 293 F.Supp. 214 (S.D.N.Y.1968). Jurisdiction may also be found in 28 U.S.C. § 1331 insofar as a question concerning more than $10,000 arising under the alleged violation of federal statutes 39 U.S.C. §§ 3210, 3211, 3212 and 3213 is involved.

■ Despite these specific jurisdictional statutes, this court would be without jurisdiction to entertain plaintiff's complaint if plaintiff could not show that he had standing so as to present a case or controversy to this court under Article III, Section 2 of the Constitution. To establish his claim to standing, the plaintiff asserts that by virtue of the defendant's abuse of the franking privilege, 39 U.S.C. §§ 3210 to 3213, the defendant

has communicated and will continue to communicate without costs of postage with all of his present constituents as well as with voters in those towns of the newly formed Congressional district which defendant seeks to, but does not currently, represent. Such impermissible communication, plaintiff contends, unfairly enhances the defendant's election chances by affording him broad access to the electorate without his having to pay for postage. Although the plaintiff claims that he is thereby injured, the harm alleged to be suffered by the plaintiff as the opposition candidate is not only a personal one; it is also a harm to the voters whom plaintiff seeks to represent. But the fact that the plaintiff may not be asserting only his own personal right in this matter does not necessarily bar him from standing. *See* Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed. 2d 92 (1972). As the candidate of a major political party whose campaign is allegedly disadvantaged by the opponent's use of the frank purportedly in violation of the statutory standard, plaintiff sufficiently demonstrates the necessary qualifications for standing, i. e., the requisite adversity of interest and strong personal stake in the outcome of the litigation. Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ Plaintiff has also alleged a violation of his civil rights and his right to run for office. This claim rises to the level of the Constitutional claim asserted by the plaintiffs in Bullock v. Carter, *supra,* in which the Supreme Court assumed that plaintiffs who were candidates for political office had standing to challenge the Constitutionality of an election practice which placed them at a severe disadvantage vis-a-vis other candidates. Plaintiff thus has standing to assert that defendant's use of the

franking privilege violates plaintiff's Constitutional rights.

■ Plaintiff finally asserts the right to challenge defendant's *receipt* of government publications allegedly in violation of federal statutes such as 44 U.S.C. § 732 which regulate the distribution of government publications among members of Congress. As to this last claim, plaintiff does not possess the strong personal stake sufficient to warrant standing. Plaintiff has not shown in what manner he will be demonstrably injured by virtue of the fact that Congressman Helstoski may have received more than his authorized allotment of Government publications from the Government Printing Office or from other Congressmen. The injury which plaintiff alleges, and which he has standing to assert, derives from the *distribution* of materials by defendant, not from the manner in which such materials were received by him.[3]

## II

### JUSTICIABILITY

Having determined that this court has jurisdiction over the subject matter of plaintiff's complaint insofar as it relates to the distribution of materials under the Congressional frank, I must now determine:

(1) "whether the claim presented and the relief sought are of the type which admit of judicial resolution," and
(2) "whether the structure of the Federal Government renders the issue presented a 'political question'—that is, a question which is not justiciable in federal court because of the separation of powers provided by the Constitution."

Powell v. McCormack, 395 U.S. 486, 516, 517, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491 (1969).

■ Under the standards set forth in Baker v. Carr, 369 U.S. at 198, 82 S.

---

3. Plaintiff has not asserted taxpayer status in his complaint. The effect of plaintiff's possible status as a taxpayer on standing with respect to the relief sought has therefore not been considered.

Ct. 691, 7 L.Ed.2d 663, the claim presented admits of judicial resolution. First, the duty asserted, that which consists in proper use of the frank, can be judicially identified. Since the duty here is prescribed by statute, its identification involves nothing more than statutory interpretation and construction, tasks traditionally within the province and competence of the courts. Second, a breach of that duty can be judicially determined. Having established the general standard of frankability, this Court can, with respect to the mailings alleged, determine by its fact-finding process which mail is not frankable. Finally, the right asserted—that of plaintiff to be free from the deleterious effects of defendant's alleged abuse of the frank—is susceptible to judicial protection. As was the situation in J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the existence of a general right of civil action here under 28 U.S.C. § 1339 can give rise to a private right of action with appropriate remedies that serve to deter abuse of the federally created privilege. *See* Hoellen v. Annunzio, 348 F.Supp. 305 (N. D.Ill.1972), aff'd 468 F.2d 522 (7 Cir. 1972); Rising v. Brown, 313 F.Supp. 824 (C.D.Cal.1970); Straus v. Gilbert, 293 F.Supp. 214 (S.D.N.Y.1968). Effective relief can be rendered here in the form of damages or injunctive relief. The Speech and Debate Clause, which affords immunity to certain kinds of Congressional conduct, does not apply here and will not bar relief against the defendant if otherwise appropriate. United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); Powell v. McCormack, Hoellen v. Annunzio, *supra.*

Under the second prong of inquiry as to justiciability, I find that no political question is involved. Again the standards set forth in Baker v. Carr, *supra,* 369 U.S. at 217, 82 S.Ct. 691, 7 L.Ed.2d 663, are controlling. The resolution of what constitutes permissibly franked mail does not involve a basic question as to the structure of the government or the interplay of its branches. At stake is simply the propriety of the individual actions of a Congressman, a considerably lesser "political" involvement than was the case in Powell v. McCormack, *supra,* in which the Supreme Court rejected the notion of nonjusticiability on political question grounds. At any rate, any possibility of interference with interbranch regulation of the frank that may at one time have existed has since ceased to exist by virtue of the current express policy of the U. S. Postal Service not to be involved in "determinations as to what is or is not the 'official business' of a Member of Congress." Letter of August 12, 1971, from David A. Nelson, Senior Assistant Postmaster General and General Counsel to Thaddeus J. Dulski, Chairman, Committee on Post Office and Civil Service, in Subcommittee on Postal Service of the Committee on Post Office and Civil Service, Law and Regulations Regarding Use of the Congressional Frank 6, 7 (1971).

Finally, I reject defendant's contention that "[t]he ascertainment as to what is official business and how that business is to be conducted by duly elected Congressmen is, within broad limits, a matter which is exclusively reserved to the legislative branch of government." Defendant's brief at 32, 33. Not only does this last contention of defendant ignore the fact that it is the court's role, and not that of the Congress, to interpret legislation, but also it ignores the fact that the appropriate Congressional committee has not sought to exercise any official control over the matter. In his letter to his House colleagues, Morris K. Udall, Chairman of the Postal Service Subcommittee of the House Post Office and Civil Service Committee acknowledges that opinions he is rendering as to the scope of the frank are only to be general guidelines: "I emphasize that in some cases there is doubt and that these are my own informed judgments on legality and propriety." Letter, in Law and Regulations Regarding Use of The Frank, *supra,* at 1. Moreover,

Udall suggests the very situation that has here occurred—that "an opponent or an interested citizen could [s]eek injunctive relief in the U. S. courts and ask for an interpretation of pertinent law or regulation." *Id.* at 2. Congress has not in fact created any internal policing mechanism by which relief can be afforded to those, such as the plaintiff, who allege injury by virtue of a Congressman's violation of the franking privilege.[4]

### III

### MERITS

On the merits, I consider first plaintiff's contention that defendant violated federal law in distributing those Government documents described in GROUP I of my findings of fact, specifically, the "Yearbook of Agriculture 1963," "Capitol Symbol of Freedom," and "Consumer Product Information."

Distribution of public documents printed by order of Congress is authorized by 39 U.S.C. § 3211 which provides:

"The Vice-President, Members of Congress, the Secretary of the Senate, the Sergeant at Arms of the Senate, the Clerk of the House of Representatives, and the Sergeant at Arms of the House of Representatives, until the thirtieth day of June following the expiration of their respective terms of office, may send and receive as franked mail all public documents printed by order of Congress."

This statute has its genesis in the Act of June 12, 1895, ch. 23, § 85, 28 Stat. 622, which provided:

"The Vice-President, Senators, Representatives, and Delegates in Congress, the Secretary of the Senate, and Clerk of the House of Representatives may send and receive through the mail all public documents printed by order of Congress; and the name of the Vice-President, Senator, Representative, Delegate, Secretary of the Senate, and Clerk of the House shall be written thereon, with the proper designation of the office he holds; and the provisions of this section shall apply to each of the persons named therein until the first day of December following the expiration of their respective terms of office.

The Vice-President, members and members-elect of and Delegates and Delegates-elect to Congress shall have the privilege of sending free through the mails, and under their frank, any mail matter to any Government official or to any person, correspondence, not exceeding one ounce in weight, upon official or departmental business."[5]

Section 85 was part of a comprehensive act providing for the public printing, binding and distribution of public documents. The first paragraph alone is relevant for present purposes. It is intended to confer the franking privilege upon Congressmen and others for distribution of public documents. Prior to the passage of this Act, it appeared that Congressmen could *receive* public documents from the various departments responsible for their publication, but could not *distribute* them to libraries or constituents under their own frank. *See* 16 Op.Att'y.Gen. 511 (1880); 17 Op.Att'y.Gen. 264 (1882). As a result, large stockpiles of valuable Government documents appeared to have accumulated in the Congressional basement. The granting of the frank to Congress for the purpose of distributing such documents to the public at large was seen as necessary to clear out this burgeoning inventory and thereby to bring to the

---

4. I do not decide today whether or not the existence of such an internal policing method would have any effect on the disposition of the court as to justiciability.

5. The language of the first paragraph seems to have been derived from Section 7 of the Act of 1877, 19 Stat. 336 and from the Act of March 3, 1879, § 1, 20 Stat. 356.

public the benefit of information contained in the documents. *See* Debates on H.R. 2650, 25 Cong.Rec. 1463 (Sept. 13, 1893); 25 Cong.Rec. 2626 (Oct. 17, 1893); 25 Cong.Rec. 2667 (Oct. 18, 1893); 27 Cong.Rec. 34, 35 (Dec. 4, 1894).

Subsequent amendments to the 1895 Act did not change its substance. By the Act of June 18, 1934 ch. 606, § 2, 48 Stat. 1018, the franking privilege was extended to Resident Commissioners in Congress, and the date of expiration of the privilege was extended from December 1 to June 30 following the expiration of the respective terms of office of the Congressmen and other officials encompassed under the Act. Then again in 1958, Congress extended the franking privilege for public documents to the Secretary of the Senate. Act of July 25, 1958, Pub.L.No. 85–560, § 3(a), 72 Stat. 420. The legislative history, as far as can be ascertained, indicates no substantive change whatsoever as to the scope of the public document franking privilege. 1958 U.S.Code & Cong.Adm. News, p. 3155.

In 1960, Section 85 of the 1895 Act as amended in 1934 and 1958 was codified as 39 U.S.C. § 4162. Act of Sept. 2, 1960, Pub.L.No. 86–682, 74 Stat. 758. Although the precise wording of the provision was modified, there was no intent to change its meaning. 1960 U.S. Code & Cong.Adm.News, pp. 863–67. For example, because "Members of Congress" was defined in 39 U.S.C. § 4151 to include Senators, Representatives, Delegates and Resident Commissioners,

explicit reference to these persons was omitted. *Id.* at 925.[6]

The final amendment to the public documents franking provision occurred in the Postal Reorganization Act of 1970. Act of Aug. 12, 1970, Pub.L.No. 91–375, § 3211, 84 Stat. 719, in which the franking privilege was further extended to the Sergeant at Arms of the House of Representatives. Again, the legislative history reveals no substantive change as to the scope of the public documents franking privilege. *See* 116 Cong.Rec. 20445 (June 18, 1970) (House Debate on H.R. 17070); *See also* 1970 U.S.Code & Cong.Adm.News, p. 3469.

■ The final version of the public documents franking provision as it now appears in 39 U.S.C. § 3211 is thus identical with the original statute of 1895 as respects public documents sent out by Congressmen during their terms. Since no change in substance or Congressional intent has occurred since the 1895 enactment, the original Congressional intent and purpose behind the statute is controlling.

■ ■ The government publications, "The Yearbook of Agriculture" and "Capitol Symbol of Freedom" distributed by defendant clearly come within the purview of the 1895 Act, and thus within the scope of 39 U.S.C. § 3211. Each has been printed by express Congressional authorization and thus comes within the category of "public documents printed by order of Congress."[7]

As to "Consumer Product Information," it appears that this document was

---

6. Also omitted, but without explanation, was the provision requiring the persons sending out public documents under the frank to write their name and office upon the documents. In view of an explicit statement in the Report from the Committee of the Judiciary concerning the codification of this provision to the effect that anything departing from existing law was precluded from consideration in the Bill, 1960 U.S.Code & Cong.Adm.News, p. 865, by omitting the language, Congress could not have explicitly intended to extinguish the "name and office" requirement.

7. I have been unable to ascertain the specific authorizations for each of the editions of the publications sought to be enjoined. However, I find that the appearance upon each government publication of a Government document number is prima facie evidence that each is a government document authorized by Congress. For sample Congressional authorizations of other editions of the works under discussion, see H.R.Con.Res. 193, 91st Cong. 1st Sess. (April 1, 1969); Act of August 22, 1972, Pub.L.No. 92–399, tit. 1, 86 Stat. 591.

**1088**

printed by Executive Order.[8] It may well be that the Executive has been empowered by Congress to effectuate the printing of this publication, but I so far have not been able to discover the source of the Executive's authority here nor have counsel afforded me information in this regard. However, in view of the fact that I find today that the 50,000 copies of "Consumer Product Information" printed by Executive Order and allotted to defendant have already been distributed, and in view of the disposition I shall reach as to possible damages, I need not and do not decide whether distribution of documents printed by order of the Executive comes within the scope of 39 U.S.C. § 3211.

■ Definitely not included, however, under § 3211 is the 156,000 copies of "Consumer Product Information" which defendant had *reprinted* from the Government publication *at his own expense,* and which he is in the process of distributing by a mass mailing throughout his district and throughout the municipalities which are in the district in which he is presently a candidate. I find that since these particular documents were not printed "by order of Congress" but rather at defendant's own expense and initiative, they cannot be distributed under authority of 39 U.S.C. § 3211. Although it may be argued that distribution of such unauthorized reprints containing the identical information as authorized Government publications serves the broader purpose of informing the public, this view does not accord with the restricted scope given to the public documents franking privilege by the framers of Section 85 of the 1895 Act. Whether or not such reprints may be frankable under another section of the franking statutes is a matter which will be taken up shortly.

■ Plaintiff contends that even though public documents may be distributed under the frank, such distribution must be limited to a Congressman's constituency. Plaintiff thus seeks to enjoin public documents sent to municipalities in the new district which are not in defendant's current district. I find that the 1895 Act makes no such distinction between a Congressman's constituency and any other persons. Thus, a Congressman can distribute Section 3211 documents under his frank to any person.

■ With respect to the Agricultural Yearbooks, an additional reason exists for finding that their distribution is not in violation of the Congressional franking privilege. Such publications of the Department of Agriculture, contrary to the plaintiff's contentions, do come within 39 U.S. § 3213, which provides that Agricultural Reports emanating from the Department of Agriculture may be mailed "until the thirtieth day of June following the expiration of their terms of office, as franked mail by Members of Congress." [9]

■ Plaintiff's last contention with respect to Section 3211 is that although Government documents may be distributed under the frank, defendant's inclusion of "cover" letters in the Agricultural Yearbooks and other publications renders the mailings unfrankable under 39 U.S.C. § 3211. I find that the inclusion of letters that serve to identify a Congressman and explain briefly the reason for the distribution of the particular document accords with the spirit of the requirement in the original statute

8. *See* Letter of June 19, 1972, from GSA to H. Helstoski, regarding the distribution of the Consumer Product Information pamphlets.

9. This provision emanates from the Act of March 3, 1875, ch. 128, § 7, 18 Stat. 343:
 "[S]eeds transmitted by the Commissioner of Agriculture, or by any member of Congress or delegate receiving seeds for distribution from said Department, together with agricultural reports emanating from that Department, and so transmitted, shall, under such regulations as the Postmaster-General shall prescribe, pass through the mails free of charge."

of 1895, namely that distributors of such documents stamp their name and offices upon them. *See* n. 6 *supra.* Such a cover letter also is permitted under 39 U.S. C. § 3210, as discussion of the statutory history of that provision will soon reveal. Since Congressional intent, as the statutory history of § 3211 demonstrates, has not varied from that expressed in the 1895 Act, the inclusion of such letters does not disqualify defendant from sending out public documents under 39 U.S.C. § 3211.

## IV

I shall next consider the propriety of defendant's distribution of materials included in GROUP II, *i. e.*, reprints of "Consumer Product Information," the newsletter, the voter survey questionnaires, and the brochures on the drug problem. Defendant contends that such distributions are authorized by 39 U.S.C. § 3210 which provides in pertinent part:

"The Vice President, Members, and Members-elect of Congress, Secretary of the Senate, Sergeant at Arms of the Senate, Clerk of the House of Representatives, and Sergeant at Arms of the House of Representatives, until the thirtieth day of June following the expiration of their respective terms of office, and the Legislative Counsel of the House of Representatives, may send as franked mail—

(1) matter, not exceeding 4 pounds in weight, upon official or departmental business, to a Government official; and

(2) correspondence, not exceeding 4 ounces in weight, upon official business to any person."

At issue here is the meaning of "official business" in the above sub-section (2). To determine what Congress meant by this term, I must examine the statutory history of Section 3210.

The forerunner of Section 3210 is to be found in the second paragraph of Section 85 of the Act of June 12, 1895, ch. 23, 28 Stat. 622, which is set forth in full at page 5 *supra.* That second paragraph reads:

"The Vice-President, members and members-elect of and Delegates and Delegates-elect to Congress shall have the privilege of sending free through the mails, and under their frank, any mail matter to any Government official or to any person, correspondence, not exceeding one ounce in weight, upon official or departmental business."

As has already been seen in the discussion of the public documents franking privilege, Section 85 was a part of a comprehensive act concerning the printing, binding, and distribution of public documents. When originally reported to the House, the second paragraph of Section 85 (then being considered as Section 88 of H.R. 2560) read as follows:

"The Vice-President, members and members-elect of and Delegates and Delegates-elect to Congress shall have the privilege of sending free through the mails, and under their frank, any mail matter to any Government officials."

25 Cong.Rec. 2748 (Oct. 20, 1893). On October 20, 1893, Congressman Hayes of Iowa introduced on the floor of the House an amendment to that second paragraph, adding the following:

"Or to any person, correspondence, not exceeding 2 ounces in weight, upon official or departmental business."

*Id.* The dialogue which followed is set forth in 25 Cong.Rec. 2748, 2749, reproduced as Appendix "A" of this opinion.[10] It demonstrates that in proposing the Amendment, Congressman Hayes in no way intended to reinstate the formerly broad franking privilege that had been

---

10. Although neither party brought this dialogue to the Court's attention, after its discovery by the Court in its own re-

search, the citations thereupon were afforded counsel for comment in supplemental briefs.

entirely revoked for members of Congress in 1873. *See* Act of January 31, 1873, ch. 82, 17 Stat. 421. When asked how this Amendment would change the existing law under which the franking privilege of Congressmen had been restricted to a $150 stationery account, Hayes explained that formerly Congressmen receiving letters or documents from Departments intended to be forwarded to non-Government persons could not forward such correspondence under their own frank. *See, e. g.*, 16 Op.Att'y.Gen. 511 (1880); 17 Op.Att'y.Gen. 264 (1882). The Amendment would cover that deficiency, Hayes explained, by allowing Congressmen to forward to the intended addressees all such correspondence—that is, less than one ounce in weight [11]—under the Congressmen's own frank. The privilege accorded by the Amendment was so restricted that Hayes deemed it would not even include an independent letter addressed to a constituent in connection with the Departmental business from which had originated the Departmental communication in need of forwarding. However, Hayes further explained that under the Amendment a Congressman would be allowed to enclose his own letter with the correspondence or document originating from the Department.

The Amendment was then adopted by a close vote of 42 to 40, and receiving no further discussion in the House or Senate, it became a permanent part of the Act of 1895 as the end of the second paragraph of Section 85.

■ The explanation given by Hayes as to the restrictive nature of the Amendment, along with the one ounce limitation finally adopted (*see* n. 11 *supra*) and the specific problem to which the Amendment was addressed—*i.e.*, the inability up to that time of Congressmen to forward Departmental communications to constituents under their own frank—conclusively establish that the

provision was by no means intended to grant a general franking privilege which would permit the distribution of unsolicited correspondence or mailings to constituents or other non-Government officials on topics considered by individual Congressmen to be of general public interest.

■ Although it is certainly true that comments made by individual Congressmen as to the meaning of a statutory provision need not necessarily be afforded any particular weight in construing the provision, statements by sponsors of that provision are persuasive as to Congressional intent. *See e. g.*, Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959); United States v. International Union, UAW, 352 U.S. 567, 585–587, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); United States v. Wrightwood Dairy Co., 315 U.S. 110, 125, 62 S.Ct. 523, 86 L.Ed. 726 (1942). And special importance must be accorded to statements made by sponsors of provisions in the House where the provisions originated. *See, e. g.*, Steiner v. Mitchell, 350 U.S. 247, 254, 76 S.Ct. 330, 100 L.Ed. 267 (1956); United States v. McKesson & Robbins, 351 U.S. 305, 313–314, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

Without deciding where the actual line of demarcation between permissible and impermissible mailings under the 1895 Act lies, I conclude that under that Act, the unsolicited mailings of other than Section 3211, 3212 or 3213 documents or correspondence to other than Government officials would violate that Act. The question then remains: Has Congress changed the scope of the franking privilege in subsequent amendments and reenactments of this provision?

The first amendment of the 1895 Act was adopted in the Post Office Appropriation Bill of 1898, Act of June 13, 1898, ch. 446, 30 Stat. 443, 444, in which

---

11. Congressman Hayes had readily accepted a motion to reduce his proposed two ounce limitation to one, and it was in this form that the Amendment was discussed.

the one ounce limitation was raised to two. The Amendment was offered by Senator Cockrell on the Senate floor who explained:

"It simply increases the weight of Official matter from one ounce to two ounces. Repeatedly I and other Senators have had letters from the Departments sent back because they happened to weigh a little over one ounce."

Sen. Debate on H.R. 9008, 31 Cong.Rec. 4604 (May 5, 1898). The Conference Report on the Bill incorporated the proposed change in the weight maximum directly into the language of the 1895 Act. *See* 31 Cong.Rec. 5589 (June 7, 1898); 31 Cong.Rec. 5662 (June 8, 1898). On this basis, the Amendment passed both Houses and was enacted into law. Thus no substantive change by the 1898 Amendment was effected.

The same conclusion can be drawn from the next amendment to the second paragraph of Section 85 of the 1895 Act. By the Act of April 28, 1904, ch. 1759, § 7, 33 Stat. 441, the two ounce limitation was raised to four. Except for the change in weight, the language of the 1904 provision is identical to that of the 1895 Act. Senator Lodge, the proponent of the provision on the Senate floor, explained that the two ounce limitation had become inconveniently small. He concurred with Senator Cockrell who had had the experience of having letters in excess of two ounces returned to him only to have to divide a long piece of correspondence into two envelopes to keep within the weight limitation. The purpose of the Amendment was to remedy this inconvenience. *See* 38 Cong. Rec. 4299 (April 5, 1904); 38 Cong.Rec. 5540 (April 25, 1904) (Report of House Conferees).

■ The provision which appeared as Section 7 of the 1904 Act thus incorporated the exact language of the 1895 Act except for the weight limitation.

The legislative history makes clear that no change in the scope of the franking privilege was intended by the Amendment.

The next amendment to the forerunner of Section 3210 is to be found in the Act of March 2, 1917, ch. 145, § 36, 39 Stat. 963, which extended the franking privilege to the Resident Commissioner of Porto Rico.[12] Again, since no substantive change in the language occurred, I can infer no deviation at this point from the original intention of the Act.

■ Defendant calls to my attention a presentation given by the Hon. Thomas B. Schall of Minnesota on July 29, 1916, published in the Appendix to the Congressional Record at pages 1608–1611 in which Mr. Schall understands the franking privilege to allow information "pertaining in any way to the business of the Government" to be mailed free to any citizen. Mr. Schall's remarks, however, are not properly part of the legislative history of the provision in question. They were not even part of a legislative debate on the franking question. *See* 53 Cong.Rec. 11813 (July 29, 1916). I cannot give these remarks any more weight than those which represent the personal views of an individual member, and such personal views cannot be considered as part of the legislative history. *See* National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 639n. 34, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). So to do would permit an enactment of Congress to be subject to changes in meaning every time an individual member of Congress decided to comment thereon. An individual Congressman's views become pertinent only insofar as they are addressed to a particular provision subsequently enacted into law during a debate or other official proceeding such that an inference can be drawn that the personal views of the

---

12. The Act is entitled: "An Act to provide a civil government for Porto Rico, and for other purposes." It provides that the Resident Commissioner "shall be allowed . . . the franking privilege granted Members of Congress."

member of Congress as to the meaning of a particular provision constitute the construction adopted by those who vote upon the measure.

Legislative consideration to the portion of the franking privilege now under discussion appears next to have been given by Congress in 1958. Section 3(b) of the Act of July 25, 1958, Pub.L. No. 85–560, 72 Stat. 420, amended Section 7 of the Act of April 28, 1904, by extending the franking privilege originally created by the Act of 1895 to the Secretary of the Senate and the Sergeant at Arms of the Senate.[13] This Amendment was part of a bill entitled "Business Reply Mail" (H.R. 10320). No discussion as to the scope of the franking privilege appears anywhere in the legislative history. *See* 1958 U.S.Code & Cong.Adm. News, p. 3155. Without changing the scope of the privilege, the 1958 Amendment merely extended it to two additional officials.

▄▄ Thus, in 1960, when the Act of 1895 as amended in 1898, 1904, 1917, and 1958 was codified into 39 U.S.C. § 4161, no change whatsoever had occurred in the scope of the franking privilege. And although Section 4161 changed the language of the original Act, the 1960 codification, as I discussed earlier with respect to the codification of the public documents franking provision, did not purport to effect any change in the substance of the provision. *See* 1960 U.S. Code & Cong.Adm.News 863–67, 924–26. Pursuant to the codification, the provision which concerns us now read in pertinent part: "Members . . . of Congress . . . may send as franked mail . . . (2) correspondence, not exceeding four ounces in weight, upon official business to any person."

39 U.S.C. § 4161 (1964). Although this language on its face is susceptible to a variety of constructions, in view of Congress's expression of intent that no substantive change was to be effected by the codification, I find that "correspondence upon official business to any person" merely restated the meaning and intent of the original Act of 1895.

▄▄ Defendant next directs my attention to remarks made during consideration of legislation proposing that Members of the House be permitted to avail themselves of the Postal Patron, simplified mailing address service under their frank in their respective districts. Representative Steed, for example, was heard to justify Postal Patron mailings as facilitating, among other things, the distribution of questionnaires. 109 Cong.Rec. 24832 (Dec. 17, 1963). Such a distribution under Section 4161, as I have construed it, would not have been permissible since it was not within the narrow scope of the 1895 privilege. I cannot infer from the remarks of Congressman Steed in these debates or from those of other Congressmen expressing similar views that Congress had changed its intent as to the scope of the franking privilege. In none of the Postal Patron legislation did Congress address itself to Section 4161 or to any other provision having to do with the scope of the franking privilege. Thus, even if I were inclined to find that the debates on the Postal Patron mailing legislation bore on this problem, I would have no guidance as to the standards to apply in extending, or modifying in any manner, the scope of the franking privilege. By passing legislation on a related matter, Congress could not and did not change its legislative intent with respect to Section 4161.[14]

---

13. Moreover, it provided that:
 " 'In the event of a vacancy in the office of the Secretary of the Senate or Sergeant at Arms of the Senate, such privilege may be exercised in such officer's name during the period of such vacancy by any authorized person.' "

14. Moreover, the Postal Patron privilege as it existed under that legislation and as it now exists as a federal regulation (39 C.F.R. § 122.4(D)(2)) was and is now consistent with the then existing franking legislation. For example, Postal Patron mailings could be used to send out allotted public documents (§ 4162), copies of the Congressional Record (§ 4163), or Agricultural Reports (§ 4164).

The franking privilege thus possessed the very narrow scope provided by the 1895 Act when in 1970 Congress passed the Postal Reorganization Act, Act of August 12, 1970, Pub.L. No. 91–375, in which appears Section 3210 at 84 Stat. 719. Section 3210 of that Act, now 39 U.S.C. § 3210, brought forward the language of Section 4161 as respects a Congressman's franking privilege. Neither the Senate Report, No. 91–912 of June 3, 1970, nor the House Report, No. 91–1104 of May 19, 1970, nor finally the Conference Report, No. 91–1363, of August 3, 1970 discussed the franking privilege. The only relevant discussion occurred on June 18, 1970, when an amendment to Section 660 of the House Bill, H.R. 17070, which eventually became Section 3210 of the Act, was proposed by Congressman Henderson, Vice Chairman of the House Post Office and Civil Service Committee, and was agreed upon by the House. That Amendment merely extended the franking privilege to the Sergeant at Arms of the House and to the Clerk of the House, Congressman Henderson explained, as "their counterparts have in the other body." 116 Cong.Rec. 20445. Thus, the amendment of the language of § 4161 provided no substantive change.[15]

▇ I conclude therefore that 39 U.S.C. § 3210 as adopted in 1970 encompassed the same franking privilege as did its precursor, 39 U.S.C. § 4161, and thus embodied the narrow, restrictive franking privilege of the 1895 Act. Doubtless this may come as a surprise to Congressman Helstoski and to other members of Congress who voted on Section 3210. As far back as 1916[16] and up until 1968, Congress had received advisory opinions from the Post Office Department as to the scope of Section

4161 and its antecedents under which the franking privilege had been construed as permitting all of the mailings which Congressman Helstoski has made and intends to make. *See* Post Office Department, The Congressional Franking Privilege (1968) (P.O.D. Publication #126). Also, it appears from Congressman Helstoski's testimony that large, unsolicited public mailings of newsletters and voter opinion surveys have constituted a widespread practice among members of the House for years.

On these grounds, however, I cannot and do not conclude that Congress in 1970 adopted a franking privilege consonant with either what might have been the current practice or with the scope expressed in the Post Office Department rulings prior to 1968. First I must point out that by 1968, the Post Office Department had ceased offering these advisory opinions, properly recognizing that "[T]he Post Office Department is not vested with any authority by Congress to make binding determinations as to what is and what is not the 'official business' of a member of Congress." Memorandum of Dec. 26, 1968, in Law and Regulations Regarding Use of the Congressional Frank, *supra*, at 5. Thus, it is fair to say that in 1970 when Congress readopted the language of Section 4161, which in turn embodied the substance and scope of the Act of 1895, individual members were not relying upon or responding to any particular *official* determination as to the then scope of the franking privilege. And even if they were so relying, the legislative history is devoid of any mention of such reliance or any intent to make a change. It may be true that defendant and his co-legislators individually had in mind the scope of the franking privilege as it

---

15. As Thaddeus Dulski, Chairman of the House Committee from which the Bill emanated, explained: "This is only corrective language. All it does is clarify the situation in the House." 116 Cong. Rec. 20445 (June 18, 1970).

The House version of the Bill containing this Amendment was presented to the

Senate for consideration (116 Cong.Rec. 22279 (June 30, 1970)) and, after referral to a Conference Committee, was adopted in its present form. No other discussion of what is now Section 3210 occurred.

16. *See* 53 Cong.Rec. 13916–919 (Sept. 6, 1916).

had been expressed by the Post Office Department when they voted on the legislation. But if they did, they did not make their state of mind or their understanding known as the official expression of intent of a legislative body.

■ Nor can I construe Section 3210 consonant with what is evidently the current practice or usage. What "usage" would I avail myself of to construe the provision and construct a standard? Would I be required to poll all the members of Congress individually and ask them for what they thought they were voting? Obviously such a procedure is within neither the competence nor practical capabilities of this Court. And even if it were, such a practice would open to question the construction and interpretation of every statute passed by every legislature.

■ A law must set cognizable standards so as to be able fairly to regulate conduct and afford public scrutiny. When standards are so broad or vague so as not to be understood, they may be struck down as constitutionally infirm. Importing practice or usage into statutory construction would impart the same kind of infirmity. If a law passed by Congress can be changed and altered, not by official legislative Act, but rather by practice or usage, no scrutiny over legislative action is ever afforded the public. Congress can legislate by legislative Act alone. It is for Congress and not for this Court to enlarge, restrict, or otherwise modify Congressional franking privileges. Congress acted in 1895. In every subsequent amendment or reenactment of the law up and through 1970 it did not evince an intent in its official action to deviate from the scope of the original enactment. Nor was this intent altered in the final amendment of this section by the Act of July 9, 1971, Pub.L. No. 92–51, § 101, 85 Stat. 132, in which the franking privilege under Section 3210 was extended to the Legislative Counsel of the House. Again there was no indication in the legislative history of any intention to change the scope of the privilege.

■ I therefore conclude, as a matter of law, that Section 3210 as it is given meaning by Section 85 of the Act of 1895 prohibits all unsolicited mailings of defendant to non-Government officials that are not otherwise frankable under Sections 3211, 3212, or 3213. Since none of the other decisions brought to my attention which deal with the franking privilege have considered the 1895 Act and its bearing upon the statutory history, I do not feel bound to follow their reasoning. *See* Hoellen v. Annunzio, 348 F.Supp. 305 (N.D.Ill. 1972), aff'd 468 F.2d 522 (7 Cir. 1972); Austin v. Nedzi, Civ. No. 38488 (E.D. Mich. July 17, 1972); Rising v. Brown, 313 F.Supp. 824 (C.D.Cal.1970); Straus v. Gilbert, 293 F.Supp. 214 (S.D.N.Y. 1968).

### V

■■ I next consider the propriety of the mailings in GROUP III—that is, the results of the February or March questionnaire and the Declaration of Independence. The franked mailing of the results of the questionnaire is properly within 39 U.S.C. § 3212 which permits Members of Congress to send as franked mail "the Congressional Record, or any part thereof, or speeches or reports therein contained." I find nothing in the legislative history which prohibits the defendant from copying matter that appears in the Congressional Record, printing it at his own expense, and distributing it under his frank. As was not the case with the public documents section (§ 3211) there seems to have been no intention here to restrict distribution to actual editions of the Congressional Record as printed by order of Congress. In fact the very language of the section which permits frankable distribution of *parts* of speeches or reports certainly does not contemplate that Congressmen tear them

out of official publications.[17] The only restrictions on such mail appear to be regulatory:

"The words *Congressional Record* or *Part of Congressional Record-Free* and the signature and title, either written or printed facsimile, of the person entitled to frank it, must appear on the address side."

39 C.F.R. § 137.1 (chart).

█ As to the Declaration of Independence, however, which defendant desires to distribute as suitable for framing along with comments inserted in the Congressional Record, defendant has stipulated that these copies of the Declaration of Independence are not intended as matter taken from the Congressional Record. They therefore are merely reprints of public documents and stand in the same stead as the reprints of "Consumer Product Information" discussed earlier. The inclusion in the mailing of introductory remarks taken from the Congressional Record, which remarks themselves are distributable as franked mail under Section 3212, does not bring the sending of the entire Declaration of Independence within the authorization of Section 3212.

█ Although the defendant may thus distribute copies of the Congressional Record or any part contained therein through the mail under his frank, the question is raised whether or not such mailings may be made to Postal Patrons in the municipalities which have become part of the Ninth District by virtue of Court-ordered reapportionment.[18] A direct answer is provided by 39 C.F.R. § 122.4(D)(2) which explicitly permits franked mailings under the simplified address form

"to customers within the district the Member or Member-elect was elected to represent; *and within such other areas of the state as may be encompassed in his district under a reapportionment law*" (emphasis supplied).

Since the towns to which defendant has been sending and intends to send the mass mailings of reprinted sections of the Congressional Record are within the area encompassed by the reapportioned district as so formed by Court order in April of 1972, these mass mailings are permitted by the regulation.

## VI

█ I turn last to the mailings included under GROUP IV—that is, the unsolicited mailings of the Revenue Sharing reports and the gun control surveys to state and local officials within defendant's district or within the reapportioned Ninth District. The question presented is whether these mailings under the frank are authorized by Section 3210 which permits "matter, not exceeding 4 pounds in weight, upon official or departmental business, to a Government official" to be mailed under a Congressman's frank. I have already traced in great detail the statutory history of Section 3210 and have determined that it does not vary substantively from Section 85 of the Act of 1895. That section permitted members of Congress to send under their frank "any mail matter to any *Government official*." The first question that must be answered is whether or not state and local officials are encompassed by the term "Government Official" under this provision. The question is not free from doubt since the legislative history of the 1895

---

17. The present Congressional Record provision was derived from the Act of March 3, 1875, ch. 128, § 5, 18 Stat. 343:

"That from and after the passage of this act, the Congressional Record, or any part thereof, or speeches or reports therein contained, shall, under the frank of a member of Congress, or delegate, to be written by himself, be carried in

the mail free of postage, under such regulation as the Postmaster General may prescribe . . .."

18. This question did not arise with respect to the public documents in question, since neither the Agricultural Yearbooks nor the editions of "Capitol Symbol of Freedom" were distributed to Postal Patron addressees.

Act does not address this term specifically. But the meaning of "Government Official" *is* addressed in the Postal Laws and Regulations of the United States as compiled in House Misc.Doc.No. 90,52d Cong., 2d Sess. (1893) in reference to a similar, but earlier act, The Post Office Appropriation Act of 1891, ch. 547, 26 Stat. 1081.[19] Section 3 of that 1891 Act provided:

> "That the members and members elect of Congress shall have the privilege of sending free through the mails, and under their frank, letters to any *officer of the Government* when addressed officially." (emphasis supplied).

The Postal Laws and Regulations which were operative with respect to that Act when Section 85 of the 1895 Act was being considered state with reference to the 1891 Act:

> "The term 'officer of Government' includes only officers of the United States, Senators, Members, and Delegates in Congress."

House Misc.Doc.No. 90, *supra*, at 157. *See* Appendix B.

There being no other pertinent discussion of the term "Government Official" brought to my attention by counsel or by my own research, I conclude that the meaning of "officer of the Government" attributed to the 1891 Act is the same that should be ascribed to "Government Official" in Section 85 of the 1895 Act, the language of which, in pertinent part, closely tracks that of the 1891 Act. Thus defendant is not authorized by Section 3210 to send the Revenue Sharing report or the gun control survey to state or local officials under his frank. This being the case, and there being no other section under which such mailings are justified, I find that defendant cannot send these mailings under his frank.

## VII
## CONSTITUTIONAL CLAIMS

 Since I have found impermissible all of the defendant's franked mailings other than those which are frankable (1) as mail to Government officials under Section 3210, and (2) as correspondence, documents, reports, etc., under Sections 3211, 3212 or 3213, it is only with respect to the permissible mailings that I need decide whether or not plaintiff's Constitutional rights have been or will be violated. The question raised is whether permissible frankable mailings of, for example, large quantities of public documents or Congressional Record reprints to a Congressman's constituency during an election campaign might so adversely affect an opponent's chances as to provide an effective bar to candidacy of the kind that in Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed. 2d 92 (1972), was struck down as Constitutionally impermissible. In *Bullock,* the Supreme Court found unconstitutional an election practice which exacted exorbitantly high candidacy registration fees that effectively barred poorer candidates from running. The facts in this case show no such bar. Moreover, the situation in *Bullock* can be distinguished from that here. In *Bullock,* the State sought to justify its high candidacy registration fees as a legitimate means of financing primary elections and as a method of regulating the ballot in such primaries. 405 U.S. at 144, 145, 92 S.Ct. 849. The Supreme Court rejected as insubstantial the first justification, 405 U.S. at 147, 92 S.Ct. 849, and characterized the second as "extraordinarily ill-fitted" to the goal of weeding-out spurious candidates. 405 U.S. at 146, 92 S. Ct. 849. In contrast, in this case neither is the state interest insubstantial nor are the means ill-fitted to a legitimate governmental objective. Congress has determined that the dissemination of public documents, matter appearing in the Congressional Record, and Agricultural Reports, as well as communications with Government officials, are an essential part of the political process and has encouraged such communications under the frank. I find that whatever incremental disadvantage may accrue to the

---

19. The appropriate pages from the House Document appear as Appendix "B" of this opinion.

plaintiff here by virtue of any publicity gained by the defendant through his past or proposed mailings, such disadvantage, when weighed against the Congressional policy sought to be furthered, does not rise to the level of a violation of plaintiff's Constitutional rights.

## VIII

### RELIEF

Having decided that plaintiff has a private remedy under the theory enunciated by the Supreme Court in J. I. Case v. Borak, *supra,* which I discussed earlier, I now turn to the question of appropriate relief. Under the theory of *Borak,* the implied private cause of action is designed to deter violations of the statute. *See, e. g.,* Pearlstein v. Scudder & German, 429 F.2d 1136, 1140 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971); Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74, 78, 85–90 (S.D. N.Y.1968), aff'd mem., 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969). Deterrence can be achieved by affording the private litigant injunctive relief and/or damages.

In the present situation, I find on balance that the deterrent effect of damages is outweighed by the resulting inequity and disruption that might ensue. I cannot, for example, ignore the fact that the defendant has acted in good faith and on the example of many others who have used their frank for similar mailings. In fact, defendant had received advisory opinions from the House Committee on Standards informing him that his mailings were permissible. The opinions were, of course, merely advisory and have no binding force on this Court. They have not been enacted into law nor been incorporated into the Code of Federal Regulations. But they do point to the Congressman's good faith. This is not to say, of course, that the defendant's ignorance of the law provides an excuse for its violation. But I am not unmindful of the fact that to permit damages against the defendant and thus to open the floodgates for damage actions against large numbers of Congressmen could wreak havoc with the daily workings of the Legislative Branch. Furthermore, the real damages that have accrued from abuse of the frank are those to the taxpayer. Although assessment of damages at the face value of postage which · defendant should have used to mail the impermissibly distributed material would certainly serve to deter further violations of the statute, such damages would prove an unfair windfall to the plaintiff.

Having determined that the plaintiff is entitled to relief, but that the appropriate relief as revealed by the record is not to be found in damages but rather is injunctive in character, I will sign an order in accordance with my opinion granting an injunction against impermissible mailings as found herein.

This opinion shall be sufficient to constitute compliance with Rule 52 of the Federal Rules of Civil Procedure insofar as it contains findings of fact and conclusions of law.

The parties will submit an order at the earliest possible time consistent with my opinion. Each party will bear its own costs.

APPENDIX "A"

VOLUME 25

CONGRESSIONAL RECORD—HOUSE

October 20, 1893
pp. 2748, 2749

The Clerk, proceeding with the reading of the bill, read as follows:

SEC. 88. The Vice-President, Senators, Representatives, and Delegates in Congress, the Secretary of the Senate and Clerk of the House of Representatives may send and receive through the mail all public documents printed by order of Congress; and the name of the Vice-President, Senator, Representative, Delegate, Secretary of the Senate, and Clerk of the House shall be written thereon, with the proper designation of the office he holds; and the provisions of this section shall apply to each of the persons named therein until the 1st day of December following the expiration of their respective terms of office.

The Vice-President, members and members-elect of and Delegates and Delegates-elect to Congress shall have the privilege of sending free through the mails, and under their frank, any mail matter to any Government official.

Mr. HAYES. I offer the amendment which I send to the Clerk's desk.

The Clerk read as follows:

Add to section 88 the following:

"Or to any person, correspondence not exceeding 2 ounces in weight, upon official or departmental business."

Mr. HAYES. Mr. Chairman, it is well known that the franking privilege formerly existed to an almost unlimited extent, and that by reason of abuses of that privilege it was practically entirely done away with. Since then it has been allowed to send letters to Government officials, but no provision has been made for sending what we get from the Departments to the persons to whom the letters or documents are to be sent, and it is by no means universal that penalty envelopes are sent for that purpose by the Departments. It seems to me this ought to be made to cover that deficiency, and it is so worded as to guard it against abuses, limiting it to departmental and official business, and also limiting the weight to 2 ounces.

Mr. RICHARDSON of Tennessee. I can not hear the gentleman from Iowa [Mr. HAYES], and I am quite sure other gentlemen are unable to hear what he has said. I will ask the gentleman to repeat the substance of what he has said.

Mr. HAYES. Let the amendment be again read. That will explain itself.

The amendment was again read.

Mr. HAYES. I do not care about the question of weight; but I thought that would be small enough.

Mr. RICHARDSON of Tennessee. I move to strike out "two" and insert "one."

Mr. HAYES. I accept the amendment. That is entirely satisfactory.

The CHAIRMAN. The Chair understands the gentleman from Iowa to modify his amendment?

Mr. HAYES. I do.

Mr. McMILLIN. I was going to ask the gentleman where it varies from the present law? We now have the right to send letters to the heads of Departments.

Mr. HAYES. Yes; but there is no provision made in the law for sending what you get from the Departments to those for whom you make the inquiry; and the return letters are not sent in all instances. They are generally from the Pension Office, but not from the other Departments.

Mr. McMILLIN. But we have a stationery account now. That was given originally in lieu of the franking privilege, as I understand it.

Mr. HAYES. That is very true; but this does not give full franking privilege. It simply gives a very limited amount, so far as weight or bulk is concerned, and refers entirely to departmental and official business.

Mr. McMILLIN. But what I was calling the attention of the gentleman to was that when the franking privilege was abolished the present stationery account was given in lieu of that, as I have been informed, although I have not made an examination of the fact.

Mr. HAYES. There is no doubt about that.

Mr. McMILLIN. And the stationery account remains still if this amendment is adopted.

Mr. HAYES. There is no reason to change that, because this only relates to letters from the Departments; and the franking privilege was for all purposes. I do not know how true it is; but to illustrate what was said about the franking privilege, I have heard it said a dozen times that members used to send their washing home under the franking privilege. [Laughter.] Perhaps that was really meant as an illustration of the extent to which it was used.

Mr. McMILLIN. Congress cut off the washing, but gave $150 of stationery account. Now, are we to add the washing? [Laughter.]

Mr. HAYES. No; it simply applies to letters such as relate to departmental and official business; and it seems to me that there can be no objection to the amendment.

Mr. OATES. If the gentleman from Iowa will permit me. As I understand, the franking privilege was abolished by Congress because it was very much abused. It had been carried to a ridiculous extreme; then we have gone to the other extreme, and allowed $150 on stationery account.

Mr. HAYES. I think the gentleman is right in both propositions, and this is just to rectify the matter.

The CHAIRMAN: The Chair will direct the attention of the gentleman from Iowa to the reading of the amendment.

The Clerk read as follows:

Or to any person, correspondence not exceeding an ounce in weight.

Mr. HAYES. That is as I want it.

Mr. McMILLIN. This would not include a letter addressed to a constituent in connection with that business.

Mr. HAYES. Yes, sir.

Mr. McMILLIN. It is intended only that when you get a response from a Department to inclose it in an envelope and send it to the party?

Mr. HAYES. That is the why I illustrated it; that it was governmental and official business.

Mr. SIBLEY. Would it preclude me from inclosing a letter in respect to the official and departmental business?

Mr. HAYES. I think it would not, under the ruling that was made in the case of the gentleman from Massachusetts, by the Assistant Attorney-General.

Mr. McNAGNY. He held just the other way.

Mr. HERMANN. Had the Commissioner of Pensions the right to make that rule?

Mr. HAYES. I am speaking of the ruling of the Assistant Attorney-General, in which he held that he had the right to send that letter.

Mr. HERMANN. Is it under that clause of the law that permits members of Congress to avail themselves of this particular privilege?

The CHAIRMAN. The question is on the amendment offered by the gentleman from Iowa.

The question was taken, and the Chairman announced that the noes seemed to have it.

Mr. HAYES. Division.

The committee divided, and there were—ayes 42, noes 40; so the amendment was agreed to.

APPENDIX "B"

<table>
<tr><td>52D CONGRESS,<br>2d Session.</td><td>HOUSE OF REPRESENTATIVES.</td><td>Mis.Doc.<br>No. 90.</td></tr>
</table>

THE

# POSTAL LAWS AND REGULATIONS

OF THE

## UNITED STATES OF AMERICA.

COMPILED, REVISED, AND PUBLISHED IN ACCORDANCE
WITH THE ACT OF CONGRESS APPROVED
MARCH 3, 1891.

———◆———

WASHINGTON:

GOVERNMENT PRINTING OFFICE
1893.

## CHAPTER THIRTEEN.

### OF FREE MATTER.

#### OF MATTER TO BE FRANKED.

**Sec. 362. Congressional Documents.**—That from and after the passage of this act Senators, Representatives, and Delegates in Congress, the Secretary of the Senate, and Clerk of the House of Representatives may send and receive through the mail, free, all public documents printed by order of Congress; and the name of each Senator, Representative, Delegate, Secretary of the Senate, and Clerk of the House shall be written thereon, with the proper designation of the office he holds; and the provisions of this section shall apply to each of the persons named herein until the first Monday of December following the expiration of their respective terms of office. (Act of March 3, 1879, part of § 1; 20 Stats., 356.)

**Sec. 363. Congressional Record.**—That from and after the passage of this act the Congressional Record, or any part thereof, or speeches or reports therein contained, shall, under the frank of a member of Congress or Delegate, to be written by himself, be carried in the mail free of postage, under such regulations as the Postmaster-General may prescribe. (Act of March 3, 1875, part of § 5; 18 Stats., 343.)

**Sec. 364. Seeds and Agricultural Reports.**—That seeds transmitted by the Commissioner of Agriculture, or by any member of Congress or Delegate receiving seeds for distribution from said Depart-

ment, together with agricultural reports emanating from that Department, and so transmitted, shall, under such regulations as the Postmaster-General shall prescribe, pass through the mails free of charge. And the provisions of this section shall apply to ex-members of Congress and ex-Delegates for the period of nine months after the expiration of their terms as members and Delegates. (Act of March 3, 1875, § 7; 18 Stats., 343.)

**Sec. 365. Special Grants of Franking Privilege.**—All mail matter carried to the following-named persons, or sent by them under their respective written autograph signatures, will, in pursuance of the acts respectively referred to, be conveyed free of postage during their respective natural lives, namely:

Lucretia R. Garfield, by act of December 20, 1881 (22 Stats., 1).

Julia D. Grant, widow of the late President, Ulysses S. Grant, by act of June 28, 1886 (24 Stats.).

No signature or mark is necessary to the free carriage of mail matter to either of the above-named persons. The address is sufficient.

**Sec. 366. Regulations of Franking Privilege.**—No matter can be transported under the franking privilege unless admissible to the mails under the provisions of chapter 11. To entitle to free carriage the word "free" should be printed or written and signed with the name and official designation, if any, of the person entitled to frank it, on the address face of the package, except in case of matter addressed to the persons named in the preceding sections. In the case of the Congressional Record the name of the Senator, member, or Delegate must be written by himself; in other cases the name may be written by anyone duly deputed by him for that purpose. A Senator, member, or Delegate who holds his certificate of election is entitled to the franking privilege from the commencement of his term.

All franked matter may be forwarded like any other, but such matter, when once delivered to the addressee, can not be remailed unless properly franked again. A bulk package of franked articles may be sent to one addressee, who, on receiving and opening the package, may place addresses on the franked articles and remail them for carriage and delivery to the respective addresses.

So far as foreign countries are involved, the "frank" is good only for articles for Canada and Mexico.

"That the members and members-elect of Congress shall have the privilege of sending free through the mails, and under their frank, letters to any officer of the Government when addressed officially." (Act of March 3, 1891, 26 Stat., 1079.)

In carrying out this enactment, which is now operative, the following rules must be observed:

1. The privilege conferred applies to members of both branches of Congress—Senators, Representatives, and Delegates—including not only those who have taken their seats as such, but those who have been elected, have received their certificates of election, and hold the *prima facie* right to seats. Senators and Representatives whose terms have expired are not entitled to the benefits of this act.

2. Letters to be entitled to free transmission under the act must in every case be addressed to a Government official—not necessarily at Washington, but anywhere in the United States—whose office title must be given in the superscription of the latter, either with or without his name. For example, "Brigadier-General Samuel B. Holabird, Quartermaster-General, U. S. A., Washington, D. C.;" "Postmaster, New York, N. Y.;" "Hon. David M. Key, U. S. District Judge, Chattanooga, Tenn." The term "officer of Government" includes only officers of United States, Senators, Members, and Delegates in Congress.

3. The name of the franking Senator, Representative, or Delegate, written or impressed, must appear on the envelope of the letter, in connection with the initial of his office, and preceded by the word "Free." For example, "Free—John R. Smith, U. S. S.; " or "Free—Richard Roe, M. C."

4. The term "letters" as used in this law means such communications as are denominated in the laws mail matter of the first class.