Alfred D. SCHIAFFO, Appellant in
No. 72–2168,

v.

Henry HELSTOSKI, Appellant in
No. 72–2167.

Nos. 72–2167, 72–2168.

United States Court of Appeals,
Third Circuit.

Argued June 19, 1973.

Decided Jan. 4, 1974.

Rehearing Denied Feb. 21, 1974.

other materials. *See* Schiaffo v. Helstoski, 350 F.Supp. 1076 (D.N.J.1972).[2]

Alfred A. Porro, Jr., Porro, Conaghan & Murray, Lyndhurst, N. J., for Henry Helstoski.

Robert B. Budelman, Jr., Westwood, N. J., for Alfred D. Schiaffo.

George B. Haddock, H. Graham Morison, Courtney Whitney, Jr., Morison, Murphy, Abrams & Haddock, Washington, D. C., for Comm. on House Adm. U. S. House of Representatives, amicus curiae.

Before VAN DUSEN, ALDISERT and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this case we are called upon to consider questions of justiciability arising under statutes relating to the privilege of congressmen to send mail under the frank,[1] and then to examine the scope and meaning of those enactments. 39 U.S.C. §§ 3210–3212.

Appellant, Henry Helstoski, a member of the United States House of Representatives, representing the Ninth Congressional District in New Jersey, challenges the district court's judgment to the extent that it enjoins him from mailing certain materials under his frank. He regards all such mailings as part of the conscientious performance of his legislative duties. Appellee, Alfred D. Schiaffo, Helstoski's opponent in the general election held in November, 1972, cross-appeals from that portion of the district court's judgment that permits the mailing under the frank of certain

### I.

Specifically, the district court divided the mailings and proposed mailings of Helstoski into four groups.

Group I consisted of documents printed pursuant to congressional or executive order. Applying 39 U.S.C. § 3211, the district court decided that those documents printed by congressional order could be sent under the frank to persons not then in the Ninth Congressional District but who were to be included in the redistricted Ninth Congressional District for the November, 1972 election, as well as to all those in the Ninth Congressional District before the redistricting. Furthermore, the court found that Schiaffo had no standing to challenge under 44 U.S.C. § 732 Helstoski's receipt of government documents in excess of his allotment. Those printed pursuant to executive order had already been sent at the time of the suit, thereby precluding any relief, for the court refused to grant money damages to Schiaffo. The court did not decide whether such mailings were otherwise permissible. It did permit Helstoski to send brief covering letters with the documents printed pursuant to congressional order, identifying the Congressman as the sender and explaining the reasons for the distribution.

Schiaffo challenges the court's ruling insofar as it permitted the mailings of documents printed pursuant to congressional order to the new constituents of the Ninth Congressional District and the mailings of documents Helstoski received in excess of his allotment.

1. 39 U.S.C. § 3201 reads as follows:
 "(3) 'frank' means the autographic or facsimile signature of persons authorized by sections 3210–3216 and 3218 of this title to transmit matter through the mail without prepayment of postage or other indicia contemplated by sections 733 and 907 of title 44; . . . ."
 Section 3201 and those referred to therein together grant to congressmen, among others, the privilege to send material through the mail at no personal expense so long as the boundaries of the statute are not violated.

2. After trial of Schiaffo's complaint requesting a permanent injunction, such an injunction was issued restraining the distribution of certain materials found to be improper under Chap. 32 of 39 U.S.C. (P.L. 91–375).

Group II included reprints of documents received in limited quantities from governmental departments. These reprints were prepared at Helstoski's expense. Other documents included in this group were Helstoski's "Washington Report," a newsletter prepared periodically to inform recipients of Helstoski's activities, two questionnaires, and a brochure on the drug problem prepared by private individuals. These documents, too, were printed at Helstoski's expense. Helstoski either sent or intended to send all of the documents in Group II to persons in the redistricted as well as in the then existing Ninth Congressional District. Applying 39 U.S.C. § 3210(2), the court enjoined further mailings of documents in this group. Helstoski and the Committee on House Administration of the House of Representatives, as amicus curiae, challenge this ruling.

Group III contained two types of documents: first, the results of one of Helstoski's questionnaires inserted in the Congressional Record and second, parchment copies of the Declaration of Independence together with a statement inserted in the Congressional Record and intended to be sent to Republican and Democratic County Committee people, officials, schools and libraries. Helstoski planned to send all of the Group III documents to persons in areas to become part of the Ninth Congressional District as well as in areas then included. Applying 39 U.S.C. §§ 3212, the court found the distribution of the first portion of materials in Group III permissible, but enjoined the second. Schiaffo apparently challenges the court's ruling as to the first distribution insofar as it applies to mailings to persons who, at the time of the November, 1972 election, would be within the Ninth Congressional District for the first time.

Group IV contained copies of a revenue sharing report sent to public officials in the then existing and the new Ninth Congressional District, and a gun-control survey sent to police chiefs in both areas. All of these materials were printed at Helstoski's expense. Applying 39 U.S.C. § 3210(1), the court found these mailings under the frank impermissible.

The district court refused to grant money damages to Schiaffo for injury allegedly resulting from the mailings, completed prior to suit,[3] that transgressed the statutory restriction. Schiaffo does not, on this appeal, challenge this ruling. As to the mailings permitted under the statutes, the district court found no violation of Schiaffo's rights. This latter ruling Schiaffo does challenge.

Suits such as this one, calling in question the uses of the franking privilege by congressmen, have arisen with some frequency in the past few years.[4] They present difficult questions of justiciability, and it is incumbent upon us to deal with such questions before addressing the correctness of the statutory construction placed on 39 U.S.C. §§ 3210–3212 by the district court.

If, in the context of this case, it should appear that any doctrine either of constitutional or of judicial origin requires our forebearance, we may be obligated to dismiss this appeal or to remand for dismissal of the case or of portions thereof.

## II.

■ A. *Mootness*—The fact that the election of November, 1972 is now history—Helstoski was reelected—prompts us to consider whether "events subsequent to the judgment of the trial court rendered on October 10, 1972 have so af-

---

3. The district court denied Schiaffo's motion for a temporary restraining order on September 25, 1972. Final decision was issued on October 10, 1972.

4. *E. g.*, Hoellen v. Annunzio, 468 F.2d 522 (7th Cir. 1972), petition for cert. denied 412 U.S. 953, 93 S.Ct. 3001, 37 L.Ed.2d 1006 (1973); Van Hecke v. Reuss, 350 F.Supp. 21 (1972); Bowie v. Williams, 351 F.Supp. 628 (E.D.Pa.1972); Rising v. Brown, 313 F.Supp. 824 (C.D.Cal.1970); Straus v. Gilbert, 293 F.Supp. 214 (S.D.N.Y.1968).

fected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have arguably been compromised."[5] We must examine the stake that each of the parties now has in the outcome of this proceeding to determine whether it is proper to regard this appeal as moot.[6]

Helstoski, like most of his colleagues in the Congress,[7] has regularly made mailings similar to those the court below enjoined. Although he has been reelected on three previous occasions, mailings of the type now enjoined continued with no apparent interruption until the district court's order. There is nothing in the record indicating, and no reason to assume, that Helstoski's interest in continuing the practice of informing his constituents through the unsolicited mailing of various materials under his frank has substantially diminished since his fourth reelection in November, 1972. The district court's order contains no expiration date, and Helstoski remains subject to its interdictions. It is apparent, therefore, that Helstoski has a considerable stake in this appeal.

One might suspect that the strength of Schiaffo's interest in preserving those elements of the district court's judgment favorable to him has lessened somewhat since his defeat in the November, 1972 election. But anybody who personally intends to oppose the candidacy of an incumbent congressman or who supports a person mounting such a challenge has a vital interest in securing the cessation of that incumbent's activities —financed at least in part by the public fisc—that arguably promote his electoral prospects. Certainly Schiaffo is one who may continue to oppose, personally or otherwise, the incumbency of Helstoski. Moreover, both parties have diligently presented their respective arguments to this Court.[8] Consequently, we conclude that this appeal has not been mooted by the November, 1972 election.

█ B. *Speech or Debate Clause*— Helstoski argues that the Speech or Debate Clause, Art. I, § 6 of the Constitution,[9] precludes judicial inquiry into potential abuse of the franking privilege. We do not find this contention persuasive. Although the limits of the immunity afforded congressmen by the Speech or Debate Clause are not clearly defined by judicial precedent,[10] in United States v. Brewster [11] the Supreme Court appears to have placed important restrictions on the ambit of that provision. The Court in *Brewster* found that the Speech or Debate Clause did not preclude a prosecution of a senator for bribery so long as there was no inquiry into legislative acts or motivation.[12] "In sum," the Court held, "the Speech or De-

5. Note, Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1674 (1970).

6. *See generally* Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L. J. 1363, 1383–86 (1972).

7. See, for example, the guidelines for the use of the frank suggested by the Post Office Department in its Publication 126, issued April, 1968 and entitled "The Congressional Franking Privilege."

8. *See* Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

9. "[F]or any Speech or Debate in either House, they [Senators or Representatives] shall not be questioned in any other place."

10. "In part because the tradition of legislative privilege is so well established in our polity, there is very little judicial illumination of this clause." United States v. John-

son, 383 U.S. 169, 179, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966). In *Johnson*, the Court prohibited the use of the content of a congressman's speech in the House and the motivation for such speech as evidence in a criminal action in which the congressman was a defendant. Since *Johnson*, four cases raising important questions concerning the Speech or Debate Clause have reached the Supreme Court. *See* Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

11. 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

12. *Id.* at 525, 92 S.Ct. at 2531.

bate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts."[13] *Brewster* has placed many activities "related" to the performance of a congressman's duties outside the protection of the Speech or Debate Clause.[14] Significantly, Chief Justice Burger, writing for the Court in *Brewster*, included among the "related," but unprotected Congressional activities the preparation of a newsletter.[15] Although we are dealing with, for example, the mailing under the frank, not the preparation, of a newsletter, we believe that the thrust of *Brewster* requires us to regard Helstoski's use of the frank to mail the materials in this case as outside the protection of the Speech or Debate Clause. Mailings of items such as newsletters may well be necessary if a congressman is conscientiously to perform his legislative tasks. But *Brewster* makes it clear that the immunity of the Speech or Debate Clause does not extend to a number of legitimate legislative activities, and we would include among such activities the mailing of

materials under the frank. Accordingly, we reject Helstoski's contention that the federal courts should refuse, on the authority of the Speech or Debate Clause, to entertain suits involving allegations of abuse of the franking privilege.

C. *Political Question*—Federal courts have, on occasion, declined on the basis of the political question doctrine to confront certain conflicts otherwise properly presented for decision. The genesis of this somewhat inscrutable doctrine inheres in a notion that certain issues are not for courts to decide, either because the Constitution leaves to another branch the sole responsibility to decide them [16] or because it is wise judicial policy to refrain from resolving some matters. The latter view is derived, in part, from a recognition that the practical effectiveness of judicial decisions depends, to a large degree, on their acceptance by the public and that, in some cases, declining to decide a matter on the basis of the political question doctrine avoids untoward strain on the public acceptability of judicial pronouncements generally.[17] Baker v. Carr [18] is the cruci-

---

13. *Id.* at 512, 92 S.Ct. at 2537. In Gravel v. United States, the Court offered a similar formulation:

> The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. 408 U.S. 606, 625, 92 S.Ct. 2614, 2627.

14. *Id.* *See also* Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

15. 408 U.S. at 512, 92 S.Ct. 2531.

16. Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 7–8 (1959). "[A]ll the doctrine can defensibly imply is that the courts are called upon to judge whether the Constitution has committed to another agency of government the autonomous determination of the issue raised, a finding that itself requires interpretation."

*Id.* *See, e. g.* Powell v. McCormack, 395 U. S. 486, 518–548, 89 S.Ct. 1944 (1969).

17. *See* A. Bickel, The Least Dangerous Branch 27–28 (1962). This "prudential" view, Scharpf, "Judicial Review and the Political Question: A Functional Analysis," 75 Yale L.J. 517, 519 (1966), suggests that the Supreme Court's decisions not to decide in political question cases results as much from a sober appraisal of current political attitudes as from a strict application of legal principle. Professor Scharpf indicates, however, that considerations, other than the purely political, do prompt the Court's reluctance to decide political question cases. *Id.* at 567. Whether the political context or other, often more pragmatic, considerations result in the Court's reluctance to decide, the process itself is ad hoc judicial policymaking and the ultimate concern is maintaining the judiciary's co-equal place in the federal system. A hasty decision based on inadequate information, for example, may well impair the deference with which court decisions are received by other government officials and the public generally.

18. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

ble from which issued the Supreme Court's most comprehensive attempt to provide a framework for analysis of cases in terms of the applicability of the political question doctrine. Justice Brennan, writing for a plurality of the Court, concluded that six categories of cases could properly be regarded as involving political questions. He offered the following formulation:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[19]

In Powell v. McCormack,[20] Chief Justice Warren, speaking for the Court, used these six categories as guideposts for analyzing the justiciability of the questions dealing with Congressman Powell's exclusion by the House of Representatives. Chief Justice Warren's treatment of the *Baker* categories strongly indicates that the present case does not fit into any of them.

First, it is clear that there is no *"textually demonstrable* Constitutional commitment"* (emphasis added) to Congress of the power to decide questions regarding the exercise of the franking privilege. Also, there can be no credible argument that "judicially discoverable and manageable standards" are not present. Chief Justice Warren pointed out that "an interpretation of the Constitution . . . clearly [involves] . . . 'judicially . . . manageable standards.'"[21] Interpreting statutes is a more common practice of the federal courts than interpreting the Constitution, and we perceive no reason for regarding the franking statute as implicating standards not susceptible to judicial management. Standards of statutory construction surely are judicially manageable. In fact, since Congress has seen fit to enact a statute granting the franking privilege, we have considerable doubt whether the political question doctrine is applicable at all. We have found no case regarding the application of a statute concerned solely with domestic affairs and passed by Congress in which the political question doctrine has precluded Supreme Court review.[22]

Nor does the present case fit into any of the other *Baker* categories as they have been elaborated by Chief Justice Warren:[23] no initial policy decision is required since Congress has already made that decision; there is no need for unquestioning adherence to a policy determination already made; a court's performance of its usual function of statutory interpretation involves no lack of respect for any coordinate branch; and the judiciary's decision as to the statute's meaning is final, although Congress retains the authority to modify the statute.

Therefore, the political question doctrine does not prevent consideration of the present case.

D. *Standing*—A nettlesome question concerning the propriety of judicial review of Helstoski's actions relates to Schiaffo's standing to assert a claim un-

---

19. *Id.* at 217, 82 S.Ct. at 710.

20. 395 U.S. 486, 89 S.Ct. 1944 (1969).

21. *Id.* at 549, 89 S.Ct. at 1978.

22. *See e. g,* United States v. First City Nat'l Bank, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed. 2d 151 (1967); Hoellen v. Annunzio, 468 F.

2d 522 (7th Cir. 1972), petition for cert. filed, 412 U.S. 953, 93 S.Ct. 3001, 37 L.Ed.2d 1006 (1973). *But cf.* Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

23. 395 U.S. at 548–49, 89 S.Ct. 1944.

der §§ 3210–3212. Divising an analytical approach to provide guidance in determining whether a particular litigant has standing to present a particular issue for judicial resolution remains for courts and scholars an often assayed, but not yet satisfactorily accomplished object.[24]

In two important areas of federal concern, the Supreme Court, in recent years, has formulated rules specifically designed to assist in reaching a conclusion whether a litigant has standing. First, presented with a taxpayer's constitutional challenge to federal aid to parochial schools, the Court held in Flast v. Cohen [25] that a taxpayer has standing to challenge "congressional action under the taxing and spending clause" of the Constitution only when the taxpayer also alleges that such action is "in violation of specific constitutional protections."[26] Second, in dealing with a challenge to an action of a federal agency under § 10 of the Administrative Procedure Act,[27] the Court in Association of Data Processing Service Organizations v. Camp [28] required the plaintiff "[to allege] that the challenged action has caused him injury in fact, economic or otherwise" and that "the interest sought to be protected by [him] is arguably within the zone of interests to be protected or regulated by the statute. . . . "[29]

This Court recently dealt extensively with the subject of standing in Richardson v. United States.[30] Although when we address questions raised by the separate opinion in this case, we will deal at greater length with the reason that the principles developed in *Richardson* and, in particular in the dissent therein, seem largely inapplicable here, a brief synopsis of the major distinctions between the two cases may impart to the intervening discussion a greater degree of clarity. The plaintiff in *Richardson* contested governmental action on constitutional grounds and his standing was bottomed solely on his taxpayer status. In contrast, although asserting that if Helstoski's actions are held to be permissible under §§ 3210–3212, his constitutional rights would be violated, Schiaffo confines his objections here in the first instance, to allegations that Helstoski has violated *statutory* restrictions. Moreover, Schiaffo claims that he has suffered harm different from that suffered by the ordinary taxpayer because of Helstoski's allegedly unauthorized use of the frank.

Since the provisions relating to judicial review contained in the APA are apparently inapplicable when there is challenged to a congressman's use of the frank and since Schiaffo's situation is different from that of the plaintiffs in *Flast* and *Richardson*, who, unlike Schiaffo, assert, solely as taxpayers or citizens, claims based on constitutional provisions, it is necessary to acquire an understanding of the federal common law of standing and its relationship to, as well as differences from, the precepts contained in *Flast* and *Data Processing*.

---

24. "[T]he law of the subject is currently in turmoil. The Supreme Court has attempted to lay down guidelines, but its attempt has been largely unsuccessful." K. C. Davis, Administrative Law Treatise § 22.00 at 703 (Supp.1970) (hereinafter cited as Davis). The Supreme Court itself has labelled standing a "complicated specialty of federal jurisdiction." United States ex rel. Chapman v. FPC, 345 U.S. 153, 156, 73 S.Ct. 609, 97 L. Ed. 918 (1953). For a recent effort to place the Supreme Court's decisions concerning standing within an instructive framework see Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L. Rev. 645 (1973) (hereinafter cited as Scott).

25. 392 U.S. 83, 88 S.Ct 1942, 20 L.Ed.2d 947 (1968).

26. *Id.* at 105–106, 88 S.Ct. at 1955.

27. Section 10 provides as follows:
A person suffering legal wrong because of agency action, or adversely affected or aggrieved within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702.

28. 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

29. *Id.* at 152–153, 90 S.Ct. at 830.

30. 465 F.2d 844, 857 (3d Cir. 1972) (Adams, J., dissenting), cert. granted, 410 U.S. 953, 93 S.Ct. 1420, 35 L.Ed.2d 686 (1973).

Despite the Herculean labors of the Supreme Court in *Flast* and *Data Processing*, it nonetheless has been contended that these cases shed, at best, crepuscular light on the general standing problem.[31] However, both of these cases are instructive and, indeed, it would appear that the same principles that are set forth in *Data Processing* control here.

### 1. The federal common law of standing.

■ The basic element of the law of standing—that a prospective plaintiff show he has suffered harm distinctive from that suffered by his fellow citizen —was developed by the common law courts.[32] State courts, when confronted with a challenge to the action of a state agency and in the absence of a state statutory counterpart to § 10 of the APA, generally require that the plaintiff allege that he was injured, in fact, by the action.[33] Although prior to *Data Processing* most of the important federal cases dealing with common law standing arose under regulatory schemes with specific provisions relating to standing, the general terms of these provisions appear to invite consideration of the cases as having an important influence on, if not as part of, the federal common law of standing.[34] The federal standing requirements in suits not involving the Constitution or the APA were, and are, more rigorous than the generally applied state requirements. For example, *The Chicago Junction Case*,[35] decided before enactment of the APA, made standing under the Interstate Commerce Act

"rest on a determination that an interest by statute to be protected has been denied that protection."[36] Between the decision in *The Chicago Junction Case* and that in *Data Processing*, the federal courts, in cases dealing with other regulatory statutes providing for suit by persons "aggrieved" or "adversely affected," have been, according to Professor Jaffe, eroding the stricture set forth in *The Chicago Junction Case* that the person challenging an agency action demonstrate an interest intended to be protected by the statute.[37] Admittedly, the content and status of the federal common law of standing prior to *Data Processing* is not susceptible to lucid formulation. It would, at least, appear, however, that a person, who alleged that he had, in fact, suffered a harm against which a common law right, statute, or constitutional provision was designed to protect, clearly had standing.

### 2. The bearing of *Data Processing* on the federal common law of standing.

To dispose of the standing issue in this case, we must now evaluate the impact, if any, of *Data Processing* on the federal common law standing test. It has been suggested that the Supreme Court in *Data Processing* was promulgating a generally applicable set of standing rules despite its reference to § 10 of the APA.[38] And, even if the Supreme Court were merely construing § 10 in *Data Processing*, Professor Jaffe contends that § 10 was intended to be "no more than declaratory of existing law." [39] Thus, it would seem that Pro-

---

31. *See* Davis at §§ 22.00–3, 22.09–22.09–9.

32. *See* Jaffe, Judicial Control of Administrative Action 502. (1965) (hereinafter cited as Jaffe).

33. "By and large, the state courts follow the common law attitudes in governing judicial review of administrative action, so that the judicial doors are widely open to anyone who asserts a legitimate interest; one who is hurt in fact has standing unless a statute or 'public policy' requires otherwise." Davis at 22.03–4.

34. Jaffe at 515.

35. 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924).

36. Jaffe at 507.

37. *Id.* at 515–531.

38. *See* Scott at 659 n. 59. *But cf.* Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636.

39. Jaffe at 528.

fessor Jaffe would regard *Data Processing* as representing an important recent expression of the contents of the federal common law of standing. In sum, the cases generally, and *Data Processing* in particular, suggest and the commentators seem to conclude that the federal common law of standing is contained primarily in cases where statutory provisions such as § 10, dealing with standing and having indeterminate, but ostensibly slight, significance, are present. For this reason, we conclude, despite the fact that § 10 is not directly applicable to the case at hand, that Schiaffo's standing to bring this suit must be measured against the same criteria that are set forth in *Data Processing*.

3. The bearing of *Flast* on non-constitutional standing problems.

■ Although the same standing test enunciated in *Data Processing* seems applicable here, *Flast,* the leading authority on standing in the context of constitutional litigation, is nonetheless illuminating here also, in three respects. First, it illustrates the major concern with which the standing test deals. The Supreme Court was, above all, seeking to satisfy itself that the plaintiffs' personal stake in the outcome was compelling enough to assure aggressive and conscientious advocacy and that the issues, as framed by the parties, would not be so nebulous as to create the danger of judicial inquiry beyond customary bounds.[40] Identical considerations are present when a plaintiff's claims, as here, are based on a statute. And the *Data Processing* test is, of course, also designed to deal with such concern.

■ Second, *Flast* establishes beyond peradventure that "[t]he personal stake may come from any injury in fact even if it is not directly economic in nature."[41] In *Flast,* the plaintiffs were troubled that certain forms of governmental aid to parochial schools impaired the exercise of their First Amendment rights. The same principle assuring that noneconomic as well as economic injury can form the foundation of a plaintiff's standing, applies where a plaintiff's claim is based on a statute rather than a constitutional provision.[42] Here, it may properly be contended that the damage Helstoski's allegedly unauthorized mailings caused Schiaffo's electoral prospects constitutes a noneconomic harm.

■ Third, *Flast* illustrates that once a substantive right is granted, absent legislation to the contrary, courts may entertain suits brought by persons harmed by the encroachments on such right despite the absence of a statute expressly stating that "aggrieved" persons have standing to sue. There is no reference in *Flast* to a statute granting standing to persons injured by the alleged unconstitutional exercise of governmental power. Nor are we aware of any principle requiring the presence of a legislative enactment conferring standing as a prerequisite to a suit for the infringement of a right granted by statute.

4. The limited scope of *Richardson*.

Apart from the three considerations just noted, *Flast* would appear not to be otherwise directly apposite to the specific inquiry here.[43] Judge Aldisert, however, concludes in his separate opinion, that the principles of standing relevant to a taxpayer (citizen) suit, of which *Flast* represents a genre and as set forth in the dissenting opinion in

---

40. Richardson v. United States, 465 F.2d 844, 851–852 (3d Cir. 1972), cert. granted 410 U.S. 953, 93 S.Ct. 1420, 35 L.Ed.2d 686 (1973).

41. 465 F.2d at 853.

42. When a plaintiff is challenging administrative action, he need not claim economic injury to have standing. Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 153–154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

43. In the district court's view, the question of Schiaffo's potential standing as a taxpayer was not before it:

Plaintiff has not asserted taxpayer status in his complaint. The effect of plaintiff's possible status as a taxpayer on standing with respect to the relief sought has therefore not been considered. 350 F.Supp. at 1084, n. 3.

*Richardson*,[44] demand dismissal of Schiaffo's suit for lack of standing. While, as we shall point out, the characterization of Schiaffo's interest in this litigation as no greater than that of a mere taxpayer seems inaccurate, even if we were to characterize this as a taxpayer suit, we would not be inclined to rely on the standing discussion in *Richardson* so generously cited by Judge Aldisert. Since that discussion is contained in a dissenting opinion filed after in banc consideration, it appears to us to be, at the very least, questionable whether it reflects the views of a majority of this Court. Thus, although the principles enunciated in the *Richardson* dissent may well be correct and may perhaps be adopted by the Supreme Court when it disposes of the case on certiorari, it does not seem appropriate for us, certainly at this time, to invoke them as authority or in any other manner to fore than pass the views expressed in that dissent.

▓▓ In any event, as we have already indicated, we believe that Schiaffo's taxpayer status, which Schiaffo himself does not rely on, is not the sole or even primary basis of his standing.[45] The Supreme Court when reviewing the standing of a particular litigant has focused on the allegations set forth in the claimant's complaint to determine whether he meets the relevant standing test.[46] Since the fact that a plaintiff's claim subsequently proves to lack merit

has no bearing on his right, or standing, to bring suit in the first place, it would seem that logic dictates reliance on the plaintiff's pleadings to determine standing.

Schiaffo averred in his complaint that Helstoski's mailings under the frank gave the Congressman "a distinct and unfair advantage [vis-a-vis Schiaffo] to further his political campaign," and constituted "a continuing harm to [Schiaffo] in his effort to conduct a fair campaign."[47] Thus, Schiaffo, as an electoral opponent of Helstoski and a member of an opposition political party within Helstoski's district, claimed "some direct injury as a result of [Helstoski's alleged abuse of the franking privilege and does not suffer] in some indefinite way in common with people generally."[48] A court, of course, would be compelled to disregard a patently frivolous allegation of distinctive harm. But Schiaffo's claim of harm is not frivolous on its face, and the trial court did not so hold.[49]

▓ Although the question of monetary relief is not squarely before us, we cannot overlook that Judge Aldisert gives considerable weight to the district court's eventual denial of money damages in contending that Schiaffo has not suffered distinctive harm. The conclusion reached in that opinion is that the district court's ultimate rejection of Schiaffo's money claim transformed Schiaffo into a private attorney general,[50] representing only the interests

44. 465 F.2d 844, 857 (3d Cir. 1972) (Adams, J., dissenting), cert. granted 410 U.S. 953, 93 S.Ct. 1420, 35 L.Ed.2d 686 (1973).

45. The dissent in *Richardson* points out that the taxpayer qua taxpayer has difficulty attaining standing in cases not involving First Amendment protections. But cases like *Flast* and *Richardson* deal with constitutional challenges to governmental authority on the part of taxpayers. A taxpayer's standing to challenge abuses of *statutory*, as distinguished from *constitutional*, authority has not received full treatment. Davis at 22.-09-2.

46. *See, e. g.,* Sierra Club v. Morton, 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636

(1972); Association of Data Processing Serv. v. Camp, 397 U.S. 150, 152, 88 S.Ct. 1942.

47. Complaint of Plaintiff at ¶¶ 15–16.

48. Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1973).

49. Schiaffo testified to the suffering of harm along the lines indicated in his complaint. Transcript at 176–77.

50. See Associated Industries v. Ickes, 134 F.2d 694 (2d Cir. 1943).

of *all* citizens in circumscribing the unauthorized use of the frank by Congressman Helstoski. We do not consider such contention compelling for three reasons.

First, the district court's refusal to award money damages was not rooted in a holding that Schiaffo had not suffered distinctive harm. Rather, the district court specifically concluded that to award money damages to Schiaffo would, in effect, penalize one congressman who "has acted in good faith and on the example of many others" and represent a windfall to Schiaffo and because "the real damages that have accrued from abuse of the frank are those to the taxpayer." [51] While this language might be considered ambiguous, it appears that the district court, instead of addressing itself to the standing question, was expressing its conclusion that the facts as adduced at trial did not warrant the award of monetary relief in this case.[52] Although it is not clear whether the district court believed that §§ 3210–3212 precluded such relief in this particular situation or whether it viewed the denial of such relief as representing an authorized and sound exercise of equity jurisdiction, we need not resolve this dilemma since Schiaffo has not appealed this portion of the judgment. Nonetheless, the denial of Schiaffo's claim for money damages does not control—his standing to request such relief, especially when it does not appear that the district court believed that monetary damage would always be unavailable in cases involving §§ 3210–3212.

Second, as we have already pointed out, standing exists or does not exist at the time a complaint is filed. Thus, Schiaffo's ultimate failure to recover money damages should not weigh heavily in the inquiry as to his standing.[53]

Third, even if we are to disregard Schiaffo's damage claims, his remaining requests for injunctive relief are not primarily intended to be for the benefit of all citizens. The claims focus narrowly on specific activities of Congressman Helstoski and their effects on Schiaffo as a candidate and member of the opposition political party. Any construction that we give to §§ 3210–3212 will have stare decisis effect only in this circuit, and its precedental value elsewhere in cases involving different plaintiffs and defendants and, no doubt, different mailings, will depend on the persuasiveness of the reasoning supporting it. For example, should another plaintiff challenge the authority of a congressman other than Helstoski to make certain mailings under the frank, our decision here, it would seem, could have no res judicata effect in that case. Should Helstoski's authority to make mailings other than those at issue here be challenged, our decision similarly would have no res judicata effect. Schiaffo, in short, is not launching a broadside attack on the use of the frank by congressmen generally.

Thus, the branding of Schiaffo's interest as merely that of a taxpayer is not consistent with the allegations contained in his complaint, and it is to the complaint that we must look in disposing of the standing issue.

5. Schiaffo has alleged injury in fact.

Inasmuch as the same principles enunciated in *Data Processing* control here, we must measure Schiaffo's claim to standing against the criteria embodied therein. The elements of the *Data Processing* test are (1) that the plaintiff suffered injury in fact and (2) that the injury sought to be protected by the

---

51. Schiaffo v. Helstoski, 350 F.Supp. 1076, 1097 (D.N.J.1972).

52. There is some question as to the import of the district court's assertion that the real harm is to the taxpayers. However, since the statement is contained in a discussion of the court's disposition of Schiaffo's claim to damages, we do not regard it as implying that the harm to a political opponent resulting from a congressman's use of the frank that redounds to the latter's electoral benefit is insubstantial.

53. Jaffe at 507–508.

plaintiff is arguably in the zone of interests to be protected by the statute.[54]

Since it would seem that even a taxpayer suffers injury in fact from an unauthorized use of the frank, it follows that under our view of the nature of Schiaffo's interest he has suffered injury in fact, thereby meeting the first part of the *Data Processing* test.

### 6. Schiaffo is within the zone of interest to be protected by §§ 3210–3212.

The second requirement of the standing test of *Data Processing*—"whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected . . . by the statute"[55]—demands a more limited version of the type of inquiry utilized to determine whether a party has a cause of action under the statute. It is technically possible for a litigant to meet this second requirement, yet have no cause of action.[56] However, if the statute gives a litigant a cause of action, he has, *a fortiori*, standing.[57] In light of the discussion to follow in subsection E and the conclusion reached there that Schiaffo has a cause of action under §§ 3210–3212, it would appear unnecessary to outline in detail the reasons for our conclusion that the interest sought to be protected by Schiaffo is "arguably within the zone of interests to be protected" by §§ 3210–3212.[58]

### 7. Schiaffo's standing under 44 U.S.C. § 732.

Despite what we have said regarding §§ 3210–3212, we agree with the district court's holding that Schiaffo does not have standing to challenge, under 44 U. S. C. § 732,[59] Helstoski's receipt of public documents in excess of his allotment. Schiaffo argues that these documents should have gone to Congressman Ryan's "successor in office."[60] Although we recognize that Schiaffo may be placed at an electoral disadvantage vis-a-vis Helstoski because of the latter's windfall receipt in excess of his allotment of documents printed at government expense, neither the language of the statute nor any other evidence of its purpose suggests that Schiaffo's interest is arguably within the interests sought to be protected by § 732.

E. *Statutory Cause of Action*—The landmark case implying a private remedy from the violation of a federal regulatory statute is J. I. Case Co. v. Borak.[61] There a stockholder of Case, alleged that a merger had been consummated as a result of a false and misleading proxy statement abridging § 14(a) of the Securities Exchange Act of 1934,[62] and sought rescission of the merger or, in the alternative, damages. Although the Act failed to provide expressly for a private right of action based on a violation of § 14(a), the Supreme Court implied a right of action (1) because § 27 of the Act,[63] which stipulated that the district courts would have "exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by [the Act]," made it "clear that private parties have a right . . . to bring suit for violation of § 14(a) of the Act,"[64] and (2)

---

54. *See* pp. 421–422 *supra.*

55. *Id.* at 153, 90 S.Ct. at 830.

56. *See id.* at 156–158, 90 S.Ct. 1942.

57. *See generally* Hardin v. Kentucky Utilities Co., 390 U.S. 1, 5–7, 88 S.Ct. 651, 19 L.Ed. 2d 787 (1968); Russell v. Continental Illinois Nat'l Bank & Trust Co., 479 F.2d 131 (7th Cir. 1973); *cert. denied,* 414 U.S. 1040, 94 S.Ct. 541, 38 L.Ed.2d 331 (1973).

58. 397 U.S. at 153, 90 S.Ct. at 830.

59. Section 732 reads as follows:
 Reelected Members may distribute public documents to their credit, or the credit of their respective districts in the Interior or other Departments and bureaus, and in the Government Printing Office, during their successive terms and until their right to frank documents ends.

60. 44 U.S.C. § 731. Apparently an aide to Congressman Ryan, upon transferring to Helstoski's staff, brought with him Congressman Ryan's allotment of the Yearbook of Agriculture, 1963.

61. 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

62. 15 U.S.C. § 78n(a).

63. 15 U.S.C. § 78aa.

64. 377 U.S. at 430–431, 84 S.Ct. at 1559.

because to effectuate fully the Congressional purpose to protect investors, "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission action." [65]

Previously, in Steele v. Louisville Railroad Co.,[66] the Supreme Court permitted a private suit to enforce a union's duty under the Railway Labor Act to represent all employees in a craft without discrimination, in the absence of a specific statutory grant of such remedy. The Court, in *Steele* reasoned, in part, as follows:

In the absence of any available administrative remedy, the right here asserted, to a remedy for breach of the statutory duty of the bargaining representative to represent and act for the members of the craft, is of judicial cognizance. That right would be sacrificed or obliterated if it were without the remedy which courts can give for breach of such duty or obligation and which it is their duty to give in cases in which they have jurisdiction.[67]

Although courts have determined in other cases whether or not a right of action may be implied from a federal regulatory statute,[68] none enunciates more explicit standards than those set forth in *Borak* and *Steele* for reaching such conclusion. Hence *Borak* suggests that we are to decide whether Congress intended that a private remedy exists, and in reaching our decision we must examine (1) the statutory scheme and (2) the need for a private remedy to effectuate the Congressional purpose. As to the latter consideration, it is necessary to ascertain, as the Supreme Court did in *Steele*, whether the restrictions imposed in §§ 3210–3212 would be enforced in the absence of private suits.

It is not helpful at this point to set out the canons of judicial interpretation of statutory language and of legislative history.[69] None of the present or past statutes relating to the frank specifically grants any private individuals or governmental entities a remedy for injury caused by a congressman's abuse of the privilege.[70] We have found no evidence in the legislative history of the various enactments suggesting that Congress specifically considered the enforcement problem.[71] There is not even a provision equivalent to § 27 of the Securities Exchange Act indicating which courts have jurisdiction to entertain suits involving the statute.[72] In short, the first consideration suggested by *Borak*—the statutory scheme—offers no clues as to whether there is a private cause of action here.

■ We cannot infer, however, from the absence of reference to enforcement that Congress believed that a mere declaration of restrictions would produce

---

65. *Id.* at 432, 84 S.Ct. at 1560.

66. 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

67. *Id.* at 207, 65 S.Ct. at 234.

68. *See, e. g.*, T.I.M.E., Inc. v. U. S., 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959); Moore v. Chesapeake & O. Ry., 291 U.S. 205, 54 S.Ct. 402, 78 L.Ed. 755 (1934); Texas & P. Ry. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916); Ivy Broadcasting Co. v. American Tel. & Tel. Co., 391 F.2d 486 (2nd Cir. 1968); Fitzgerald v. Pan Am. World Airways, Inc., 229 F.2d 499 (2nd Cir. 1956); Jacobson v. New York, N. H. & H. R. R., 206 F.2d 153 (1st Cir. 1953), aff'd per curiam, 347 U.S. 909, 74 S.Ct. 474, 98 L.Ed. 1067 (1954).

69. *See* section III, *infra*.

70. The bulk of the present statutes relating to the frank are contained in 39 U.S.C. §§ 3201–3218.

71. Although informative, we do not consider as compelling evidence of legislative intent a memorandum from Representative Udall, Chairman of the Postal Service Subcommittee of the House Post Office and Civil Service Committee, to his colleagues, stating that "[c]onceivably, an opponent . . . could . . . seek injunctive relief in the U.S. courts and ask for an interpretation of pertinent law or regulation."

72. 28 U.S.C. § 1339 does contain a general grant of original jurisdiction to the district courts in "any civil action arising under any Act of Congress relating to the postal service."

conforming behavior on the part of those subject to the statute, even if those so subject are, among others, the individual congressmen themselves. In other words, by placing restrictions upon the use of the frank, Congress must necessarily have intended that those restrictions be enforced.

Prior to 1968, the Post Office Department would make determinations as to the propriety of particular uses of the frank and attempt to collect postage from congressmen who, in the opinion of the General Counsel of the Department, had abused the privilege. Although none of the sections specifically relating to the frank confer authority on the Postal Service to regulate the frank, such authority might well be inferred from 39 U.S.C. § 2605, permitting the Postal Service to request the Attorney General to institute court action to recover moneys or credit "granted by . . . [it] as a result of . . . mistake . . . [or] fraudulent representations." Similarly 39 U.S.C. § 404(7) and 39 U.S.C. § 409, giving the Service the power to investigate postal offenses and civil matters relating to the Service and giving the district courts original jurisdiction over suits involving the Service, might also be construed to give the Service authority to regulate the congressman's use of the frank.

 Nevertheless, since 1968 neither the Service nor any other executive department has sought to regulate the use of the frank.[73] The fact that the Service has not passed its regulatory activities may not be a complete surprise. Its revenues are not affected by the unauthorized use of the frank; Congress appropriates funds to cover the actual cost of *all* franked mailings.[74] Hence for the last several years the only means of enforcing the restrictions of §§ 3210–3212 has been, as a practical matter, through the device of the private suit. And this situation is likely to continue so long as the Service's revenues are in no way depleted by unauthorized use of the frank. "[U]nder the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose."[75] Although, as Judge Aldisert points out, the Postal Service may well have the power to enforce the statutes, the plain fact is that since 1968, it has not attempted to do so. This is not unlike the situation in *Borak*, where the private remedy supplemented an existing enforcement power possessed by an administrative agency. Thus, until Congress provides for another method of enforcement or clearly expresses its intention that there be no enforcement by private parties, suits like the one before us must be permitted if the intent of the statutes, as expressed by Congress, is to be effectuated.[76]

Accordingly, Schiaffo may bring this suit against Helstoski under §§ 3210–3212.

**73.** Library of Congress, Congressional Research Service, The Franking Privilege of Members of Congress 171–72 (Updated 1972). Two cases illustrating that there has been some abuse are Hoellen v. Annunzio, 468 F.2d 522 (7th Cir. 1972) ; Rising v. Brown, 313 F.Supp. 824 (C.D.Cal.1970).

**74.** *Id.* at 2 and 170.

**75.** J. I. *Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560 (1964).

**76.** "Thus, in suits for damages based on violation of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy underpinning the substantive provisions of the statute." *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 402, 91 S.Ct. 1999, 2008, 29 L.Ed.2d 619 (1971) (Harlan, concurring).

In *Merriam v. Kunzig*, 476 F.2d 1233 (3d Cir. 1973), petition for rehearing denied, Adams, J. dissenting, which dealt, *inter alia,* both with questions of standing and with the existence of a cause of action under a statute which did not specifically confer such a cause of action, this Court stated: "Even assuming that [plaintiff] did not fall within a zone of interest protected by 41 U.S.C. § 253, we would be inclined to hold that his standing as a litigant should be nevertheless recognized. . . ." p. 1242, fn. 7.

### III.

A. Having concluded that this appeal is not moot, that judicial inquiry into a congressman's alleged abuses of the franking privilege is not precluded by the Speech or Debate Clause or the political question doctrine, and that Schiaffo has standing and a private cause of action under §§ 3210–3212, we can now appropriately address the contentions of the parties concerning the scope of §§ 3210–3212.

■ Statutory construction is, at best, an imperfect science. Although federal courts have long been interpreting legislative pronouncements through case-by-case application, they have, on occasion, seemed to display an unstructured use of the multivarious materials that conceivably bear on the proper interpretation of the words of statutes. The suspicion of casuistry thus generated is sometimes difficult to dispell precisely because a statute is usually an amalgam of incompatible interests represented by various legislators and a response to factual conditions that are viewed from different perspectives by individual judges as well as individual legislators. The evidence of statutory meaning thus generated does not lend itself easily to orderly analysis. There have developed, however, some general canons of statutory construction designed to arrange the consideration of the disconnected materials and to minimize the impact of particular perspectives, whether they be those of legislators or judges.

■ Unless a dispute as to the meaning of the words of a statute exists, a court has little reason to search elsewhere.[77] But the use of the words of the statute as the primary guide to its interpretation requires an appreciation of the general purpose of the legislation so that literalism does not frustrate that purpose.[78] Moreover, when the words of a statute can be fairly read to require inconsistent application to a specific situation, it is the court's role to divine the general purpose of the statute from the legislative history as contained in committee reports and in congressional debates, and from the events of the time,[79] and then to apply the statute in a manner consistent with that general purpose. Rarely should a statement by an individual legislator be taken as final.

> ". . . [O]veremphasis on legislative guides may lead to a distorted view of statutory purpose no less than literalism, for much less thought is spent on the future implications of committee reports and explanations on the floor than in choosing the words of the statute."[80]

Thus a court, eschewing its own policy predilections concerning the matters dealt with by a statute, must consider each piece of legislative and historical material in conjunction with all other such pieces, reach a considered judgment as to its general purpose, and resolve conflicts as to the proper application of the statute on the basis of such judgment.

With these principles in mind we note that section 3211 provides, in part, that ". . . Members of Congress . . . may send and receive as franked mail all public documents printed by order of Congress."

■ Schiaffo argues that recipients of mailings under this provision are lim-

---

77. "When we talk of statutory construction we have in mind cases in which there is a fair contest between two readings, neither of which comes without respectable title deeds. A problem in statutory construction can seriously bother courts only where there is a contest between probabilities of meaning." Frankfurter. Some Reflections on the Reading of Statutes. 47 Colum.L.Rev. 527, 527–28 (1947).

78. *See* Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, concurring).

79. Cox, Judge Learned Hand and the Interpretation of Statutes, 60 Harv.L.Rev. 370, 379 (1947).

80. *Id.* at 381.

ited to Helstoski's constituents and do not extend to those included in the Ninth Congressional District for the first time in the November, 1972 election. The district court disagreed. It is plain that there is nothing in the language of the statute suggesting the limitation proposed by Schiaffo. Furthermore, we conclude from our study of relevant materials that the general purpose of this and the other statutes granting the frank seems simply to permit congressmen freely to use the mails to communicate when such communication is related to the performance of their legislative responsibilities. Although frequently when the franking privilege is discussed, reference is made to mailings to constituents,[81] mailings to nonconstituents are nonetheless a necessary part of a congressman's legislative business too.[82] For example, nonconstituents may write to a congressman who has developed expertise in a particular area of public concern requesting information, and the congressman would probably be regarded as remiss if he failed to respond. Or, conversely, a congressman, seeking information regarding a specific matter, may write to a nonconstituent who has relevant information. Concededly, a congressman more often than not would send public documents to interested constituents. But since the distribution of these documents to interested citizens may well be legitimate legislative activity, we see no conflict with the general purpose of § 3211 in allowing a congressman to send public documents to nonconstituents as well.[83] We, therefore, affirm the district court's determi-

nation that mailings under § 3211 to nonconstituents are permissible.

B. The district court, relying on an 1893 dialogue on the floor of the House between Congressman Hayes, the sponsor of an amendment which ultimately became § 3210(2), and other members,[84] held that § 3210 "prohibits all unsolicited mailings . . . to non-Government officials that are not otherwise frankable under Sections 3211, 3212, or 3213." [85] This construction, based on exiguous evidence at best, was the foundation for the ruling by the district court that Helstoski's mailings of the documents contained in Group II of the district court's classification scheme was impermissible. Section 3210(2) reads as follows:

". . . Members, and Members-elect of Congress . . . may send as franked mail—

(1) matters, not exceeding 4 pounds in weight, upon official or departmental business, to a Government official; and;

(2) correspondence, not exceeding 4 ounces in weight, upon official business to any person."

The distinguished district judge, we believe, erred in failing to glean the general aim of these provisions from the disconnected pieces of legislative history relating to the franking privilege generally, from other historical sources, and from § 3210 specifically. Instead, undue reliance on the comments of a single legislator led to an interpretation that appears to subvert the general aim. That general aim, we reiterate,

---

81. *See* Library of Congress Congressional Research Service, The Franking Privilege of Members of Congress 171 (Updated 1972).

82. *Id.*

83. Although we adopt a different approach here, we recognize that it is a defensible position to regard those persons placed in the Ninth Congressional District by virtue of the redistricting as constituents of that district as soon as the redistricting plan is adopted. *But see* Hoellen v. Annunzio, 468 F.2d 522, 526 (1972). We note, however,

that our decision does not turn on the characterization of those persons as "constituents" or "nonconstituents."

84. 25 Cong.Rec. 2748–49 (1893).

85. 350 F.Supp. at 1094. § 3213 provides, in part that:
"Seeds and agricultural reports emanating from the Department of Agriculture may be mailed—

. . . . .

(2) . . . as franked mail by Members of Congress."

is to permit congressmen to use the mails to communicate when such communication is related to the performance of their legislative responsibilities.[86] With this general purpose in mind, we conclude that § 3210(2) prevents a congressman from mailing under his frank materials that may be regarded as purely personal or primarily designed to advance his electoral prospects.[87] Furthermore, in light of the "to any person" language, we hold that a congressman is free under § 3210(2) to mail material under his frank to nonconstituents. A literal interpretation of this language does not do violence to the general purpose of the statute but is, in fact, consistent with it.[88] Similarly, there is nothing in the language or general purpose of the statute to prohibit a congressman from sending an unsolicited letter to a citizen so long as the restrictions of § 3210(2) are observed.

■■■ Although we recognize that the contours of this standard, prohibiting purely personal mailings and those primarily designed to advance a congressman's electoral prospects, will remain substantially undefined unless and until § 3210 is applied by the courts, case-by-case, to varied factual contexts,[89] we have little difficulty concluding that the mailings in Group II are permissible.

Schiaffo does not suggest that any of these mailings involved Helstoski's purely personal affairs, and we have the benefit of the district court's finding that the distribution of these materials "cannot be characterized as the type of electioneering aids which are found in Rising v. Brown, 313 F.Supp. 824 (C.D. Cal.1970)."[90] Schiaffo does not assert, nor do we conclude, that this finding is clearly erroneous.

Accordingly, we reverse the holding of the district court that Helstoski's mailings of materials in Group II are impermissible under § 3210(2) and, therefore, must vacate the injunctive relief issued on the basis of this holding.

We agree with the district court that § 3210(2) applies only to mailings to federal government officials. As to the mailings in Group IV, however, we note that no determination has been made whether they meet the weight requirement of § 3210(2). Should they weigh less than 4 ounces, the mailing of these then would be permissible under our construction of § 3210(2).[91] This portion of the judgment deserves further consideration by the district court.

It is important to point out that our interpretation of § 3210 does not render § 3211 superfluous. They are *diverso intuito*. Section 3210 mailings must not

---

86. See p. 425, *supra*.

87. It is possible to regard the purpose for the sending of campaign material as "private," Hoellen v. Annunzio, 468 F.2d 522, 526 (7th Cir. 1972), petition for cert. filed, 412 U.S. 953, 93 S.Ct. 3001, 37 L.Ed.2d 1006 (1973), and thereby refer to only a single category of limitations, i. e., "private," on the use of the frank. We find, however, the use of two categories, i. e., "personal" and "campaign," more analytically appropriate.

88. Here the mailings to nonconstituents are limited to those who were to be included within the Ninth Congressional District for the first time in the November, 1972 election. We are not presented with large scale mailings to nonconstituents whose interests are not closely related to those of a congressman's own constituency. Therefore, we are not called upon to decide whether there is any further limitation on the class of potential recipients of franked mail.

89. There are several factors that a court might consider when determining whether the limits of § 3210(2) have been violated, including the contents, the timing, and the recipients of the mailings. See Hoellen v. Annunzio, 468 F.2d 522, 526 (7th Cir. 1972), petition for cert. filed, 412 U.S. 953, 93 S. Ct. 3001 (1973). In *Hoellen* the court apparently concluded that the fact that the mailings were to persons not in a congressman's present district, but who were in the district where he was a candidate, was enough to require that they be enjoined. We are not convinced, however, that in the situation present here the fact that Helstoski was making mailings to possibly future constituents by itself warrants injunctive relief.

90. 350 F.Supp. at 1083.

91. The mailing under the frank of the parchment copy of the Declaration of Independence may qualify under § 3210(2).

exceed the weight limitations therein, whereas § 3211 permits the mailing under the frank of public documents regardless of their weight.

C. Schiaffo challenges that part of the district court's judgment that allows Helstoski to send under his frank reprints of the results of his questionnaires which were inserted into the Congressional Record. Section 3212 provides as follows:

> Members of Congress may send as franked mail the Congressional Record, or any part thereof, or speeches or reports therein contained.

We find nothing in the language or general purpose of the statute to require a different result than that reached by the district court.[92]

## IV.

Schiaffo has presented for consideration his contention that if, as we have substantially held, the mailings by Helstoski are permissible under §§ 3210–3212, then these provisions abridge Schiaffo's due process rights guaranteed by the Fifth Amendment to the Constitution.[93]

The district court's conclusion that as to the mailings it found permissible, the federal interest promoted by these provisions outweighs the harm to Schiaffo is, in our judgment, correct. We would only add that the object of §§ 3210–3212 is not "unreasonable, arbitrary, or capricious" and that the means selected does have a "real and substantial relation" to that object.[94] Furthermore, it follows from these principles that § 3210(2) is not constitutionally infirm under the construction given that section by this Court.'

## V.

We reverse that portion of the district court's judgment enjoining, on the basis of its construction of § 3210(2), Helstoski's mailings, under his frank, of materials contained in Group II, and with regard to the documents in Group IV and the parchment copy of the Declaration of Independence, one of the Group III documents, we remand for further proceedings consistent with this opinion. In all other respects, the judgment of the district court will be affirmed.

ALDISERT, Circuit Judge (concurring and dissenting).

Because I do not perceive plaintiff to possess the remedy accorded him by both the majority and the district court I do not reach the merits of the claim. Accordingly I concur in that portion of the result reached by the majority which reverses the judgment of the district court and dissent from so much of the result which affirms.

I have extreme difficulty in reconciling the majority's treatment of standing with the extremely exhaustive treatment of the standing principles set forth in Richardson v. United States, 465 F.2d 844, 857–874 (Dissenting Opinion by Adams, J., in which Aldisert and Hunter, JJ., joined) (3d Cir. 1972), cert. granted, 410 U.S. 953, 93 S.Ct. 1420, 35 L.Ed.2d 686 (1973). Consistent with my own position in *Richardson*, I disagree with the majority's determination of standing on the basis of the principles therein set forth by Judge Adams.

## I.

Judge Adams' *Richardson* dissent was an anthology of *principles* and it can be stated without undue generosity that the

92. We do not mean to suggest, however, that § 3212 contains no restrictions on a congressman's use of the frank to send materials from the Congressional Record. *See* Rising v. Brown, 313 F.Supp. 824 (C.D.Cal. 1970) (the court found in § 3212 a limitation on the mailing of campaign materials similar to the one we have held to be

present in § 3210). *But see* Strauss v. Gilbert, 293 F.Supp. 214 (S.D.N.Y.1968).

93. *See* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

94. *See* Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

majority's discussion on pages 320–425 is a continuation of the overview of standing. What divided the court in *Richardson,* as what divides this court, and indeed what usually confronts any court in which a standing issue is raised, is not a conflict over the *definition* of principles, but a question of the *application* of those principles to the circumstances of the case.

Accordingly, I cannot begin to accept the majority's characterization of those *principles* as "questionable . . . [and not reflecting] the views of a majority of this Court." The *Richardson* majority challenged only the applicability, and not the authenticity, of the principles set forth by Judge Adams.

What divides this panel, then, is that which divided the *Richardson* court, what Cardozo described as a case "where the rule of law is certain, and the application alone doubtful."[1]

For my part, I have grave discomfort in equating a standing standard applicable to economic competitors claiming standing to review administrative regulations, Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), with a claimant who at best seems to be a taxpayer asserting rights associated with a candidacy for Congress.

"We begin with the proposition that . . . [Schiaffo] is a plaintiff, not a defendant, and therefore cases conferring standing upon defendants are somewhat inapplicable. Because expenditures [or lack of expenditures for postage] are attacked, *Flast*[2] and *Frothingham*[3] would appear to create a barrier at least insofar as . . .

[Schiaffo's] standing as a taxpayer is concerned. Third, the Administrative Procedure Act cases are not controlling because [in] the challenged . . . [Congressional] action . . . there have been no administrative procedural irregularities pleaded. Finally, the plaintiff has not alleged that the Congressional . . . action at issue has violated First Amendment rights or other rights previously assigned a position of paramount importance.

"Accordingly, we are left with the questions of the relative importance of the asserted . . . [federal] right and the nature of the injury suffered by the plaintiff." Richardson v. United States, 465 F.2d at 871 (Adams, J., Dissenting) (footnotes added).

The district court found that plaintiff was not entitled to money damages because "the real damages that have accrued from abuse of the frank are those *to the taxpayer.*"[4] (Emphasis supplied). This is a critical finding. It conclusively demonstrates that as a matter of law, plaintiff "has merely a general interest common to all members of the public," Ex parte Lévitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). Laird v. Tatum, 408 U.S. 1, 13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) continued the vitality of *Lévitt.*

The majority candidly recognizes that this critical conclusion of law reached by the district court destroys completely the threshold requirement of *Data Processing* and attempts to assign three reasons why the District Court's clear language cannot possibly mean what it says. First, the majority says "this language might be considered ambiguous.

1. Cardozo, Nature of the Judicial Process, 164.

2. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

3. Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

4. The district court found:
 But I am not unmindful of the fact that to permit damages against the defendant and thus to open the floodgates for damage actions against large numbers of Congressmen could wreak havoc with the daily workings of the Legislative Branch. Furthermore, the real damages that have accrued from abuse of the frank are those to the taxpayer. Although assessment of damages at the face value of postage which defendant should have used to mail the impermissibly distributed material would certainly serve to deter further violations of the statute, such damages would prove an unfair windfall to the plaintiff. Appellant's Appendix, 46a.

. . ." I disagree. The district court not only found that "the real damages that have accrued from abuse of the frank are those to the taxpayer," but also that an award of "such damages would prove an *unfair windfall to the plaintiff*." (Emphasis supplied). I find this to be capable of no reasonable interpretation than a declaration by the court (1) that any damage caused by the improper use of Congressional franking was sustained by all the taxpayers who paid taxes for the subsidization of this privilege, and (2) any award to plaintiff would be a windfall because in this context he is simply another taxpayer.

The majority continues: "Second, . . . standing exists or does not exist at the time a complaint is filed. Thus, Schiaffo's ultimate failure to recover money damages should not weigh heavily in the inquiry as to his standing." (Footnote omitted). I cannot accept any notion that standing may be conferred upon a plaintiff simply because he makes an averment in his complaint that he is entitled to money damages. Such a notion cuts across every —absolutely every—reported case from the Supreme Court, court of appeals, and district court in the judge-made law of standing. Entitlement to standing is a question of law to be decided by the court; standing cannot be a self-generating, self-serving entitlement, generated by a naked averment in the plaintiff's complaint. There is a fundamental difference between the failure of a fact-finder to award damages because of

lack of proof of damages, and a refusal of a court to award damages as a matter of law because the alleged damage was sustained by all taxpayers, and not the plaintiff in his own right.

If I follow the majority's third reason, and I confess to extreme difficulty in understanding it,[5] it seems to suggest this: (1) an injunction *in futuro* will assist plaintiff "as a candidate and member of the opposition political party." (2) Plaintiff has standing because this court's decision has only *stare decisis* effect in this judicial circuit. Patent incongruity inheres in a proposition which is anchored on one side by a contention that the abuse of the franking privilege causes financial damage to all taxpayers, and then drifts to a notion that this plaintiff is entitled to future injunctive relief because he was a candidate in the past. The limited *stare decisis* comment scarcely merits mention. But the fatal deficiency of the attempt to meet *Data Processing's* first requirement is laid bare in the majority's summation:

> Since it would seem that even a taxpayer suffers injury in fact from an unauthorized use of the frank, it follows that under our view of the nature of Schiaffo's interest he has suffered injury in fact, thereby meeting the first part of the *Data Processing* test. (Majority Op. 425).

As muddled as the law of standing may seem to be, one pristine principle has remained inviolate: the plaintiff must have a personal stake in the out-

5. "Third, even if we are to disregard Schiaffo's damage claims, his remaining requests for injunctive relief are not primarily intended to be for the benefit of all citizens. The claims focus narrowly on specific activities of Congressman Helstoski and their effects on Schiaffo as a candidate and member of the opposition political party. Any construction that we give to §§ 3210–3212 will have stare decisis effect only in this circuit, and its precedential value elsewhere in cases involving different plaintiffs and defendants and, no doubt, different mailings, will depend on the persuasiveness of the reason supporting it. For example, should another plaintiff challenge the authority of a congressman

other than Helstoski to make certain mailings under the frank, our decision here, it would seem, could have no res judicata effect in that case. Should Helstoski's authority to make mailings other than those at issue here be challenged, our decision similarly would have no res judicata effect. Schiaffo, in short, is not launching a broadside attack on the use of the frank by congressmen generally.

Thus, the branding of Schiaffo's interest as merely that of a taxpayer is not consistent with the allegations contained in his complaint, and it is to the complaint that we must look in disposing of the standing issue." (Majority Op. p. 424).

come of the controversy other than the mere fact that he pays taxes. Flast v. Cohen, *supra*; Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Frothingham v. Mellon, *supra*.

Judge Adams put it thusly in *Richardson*:

> [S]uits designed to interfere with the orderly operation of the Government, particularly with regard to taxation and appropriations, will not be entertained except in narrowly-defined circumstances. *See* Flast v. Cohen, *supra*; Frothingham v. Mellon, *supra*; W. Lockhart, Y. Kamisar & J. Choper, . . . [Constitutional Law] 68 [1970].
>
> Closely related to this principle is the admonition that a citizen who suffers equally with all other citizens will not be heard to raise generalized grievances about the conduct of the Government. *See* Sierra Club v. Morton, . . . [405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)]; Flast v. Cohen, *supra*; Baker v. Carr, *supra*; Ex parte Lévitt, *supra*; Frothingham v. Mellon, *supra*; Fairchild v. Hughes, . . . [258 U.S. 126, 42 S.Ct. 274, 11 L.Ed. 499 (1972)].

465 F.2d at 870.

I respectfully suggest that Judge Adams' expression as a dissenter in *Richardson* was eminently correct and that Judge Adams' expression as the author of the majority opinion is egregiously wrong. Accordingly, I am drawn to his conclusion in *Richardson*:

> Because . . . [Schiaffo] did not and could not allege that either he alone or some identifiable class of citizens has suffered an injury not suffered by everyone else, the conclusion would appear to follow that "he has merely a general interest common to all members of the public," [Ex parte Lévitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937)] and therefore is not endowed with standing to litigate this matter.

465 F.2d at 872–843.

Precise teachings of the Supreme Court support this conclusion. When a private individual, a "citizen" and "taxpayer," sought to challenge the adoption of the Nineteenth Amendment, the Court held that his "alleged interest in the question submitted . . . [was] not such as to afford a basis for . . . [the suit]." *Fairchild, supra*, 258 U.S. at 129, 42 S.Ct. at 275. The plaintiff had "only the right, possessed by every citizen, to require that the government be administered according to law and that the public moneys not be wasted." *Ibid*. In Ex Parte Lévitt, *supra*, a citizen sought to attack the appointment of a Supreme Court justice. The Court noted that the "[m]otion papers disclose[d] no interest upon the part of the petitioner other than that of a citizen and a member of the bar of . . . [the] Court." The Court went on to say:

> That is insufficient. It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public.

302 U.S. at 634, 58 S.Ct. at 1. Voters in *Baker, supra*, were "asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' Coleman v. Miller, 307 U.S. [433] at 438, [59 S.Ct. 972, 83 L.Ed. 1385,] not merely a claim of 'the right, possessed by every citizen, "to require that Government be administered according to law . . . .' Fairchild v. Hughes, 258 U.S. 126, 129, [42 S.Ct. 274]. . . .'" 369 U.S. at 208, 82 S.Ct. at 705. Accordingly, the Court held that the plaintiffs had standing to attack a state reapportionment plan. No such basic right of a citizen is asserted here. Rather standing is claimed on the basis of injury in fact sustained by plaintiff as a taxpayer who "suffers injury in fact from an unauthorized use of the frank. . . ." Not one Supreme Court deci-

sion supports this approach. Indeed, the decisions explicitly reject such a notion.

## II.

In the view I take, I may stop here. Since the majority concedes that Schiaffo's only standing passport to federal court depends upon the "injury-in-fact" *Data Processing* validation, he has failed, in my view, to meet the first of the two mandated requirements.[6]

I am constrained to extend my views at greater length because the highly sophisticated attempt to meet the second of *Data's* requirements proceeds from assumed facts, not in the record, which I challenge; and from there, to induced consequences, which I find fallacious.

To meet *Data's* second requirement— "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected . . . by the statute . . .", 397 U.S. at 153, 90 S.Ct. at 830—a congeries of intricacies is advanced. The argument begins with the proper statement that there is no explicit statutory authority conferring a private right of action to remedy an "injury caused by a congressman's abuse of the privilege."

As to the existence of statutory authority entitling "governmental entities" the right to pursue a remedy for such injuries, the argument gallops off in two directions. Initially, the suggestion is proffered that no such statutory authority exists.[7] Alternatively, it contends that if such statutory authority to police Congress exists, the authority is deemed ineffective because "the plain fact is that since 1968, . . . [the Postal Service] has not attempted to do so." I now address both contentions.

## A.

First, I flatly disagree with the suggestion that no governmental agency has the power to police the Congressional franking privilege. This is an essential predicate of the theory if the majority conclusion is to possess threshold support. Having asserted lack of enforcement power in any governmental agency, the argument then builds to the proposition that any enforcement of the franking statute can only emanate from the public, generally through the device of private attorney general suits like the instant case. Lacking a specific statute authorizing private suits, the majority finds one by implication, thereby satisfying the second prong of the "zone of interest test" of *Data Processing*.

I have little difficulty in discerning the fallacy in the basic premise that Congress failed to provide a governmental agency with statutory power to enforce the franking statutes. The United States Postal Service has this authority. To me this authority is so apparent as not to merit extended discussion.

It is the United States Postal Service which suffers from improper use of franking. It is the United States Postal Service whose revenues are depleted as a result of improper franking practices. It is the United States Postal Service which, with its predecessor, the office of the Postmaster General, has a history of no juniority to any department of the Executive. It is the United States Postal Service whose establishment is constitutionally mandated, Art. 1, § 8, and whose power to enforce postage regulations is explicit in Title 39, United States Code, Sections 404(7); 409; 2605; 3216(a).

---

6. Another difficulty with the majority's approach which I mention only and do not discuss in detail is the curious blending of standing principles relating to economic competition with those relating to taxpayers. Justice Douglas emphasized the distinction between the two: "*Flast* was a *taxpayer's* suit. The present is a *competitor's* suit. And while the two have the same Article III starting point, they do not necessarily track one another." *Data Processing, supra* at 152, 90 S.Ct. at 829.

7. "None of the present or past statutes relating to the frank specifically grants . . . any governmental entities a remedy for injury caused by a congressman's abuse of the privilege." (Maj.Op. 426).

The existence of these statutory provisions forms a dramatic refutation to the contention that a private remedy is required to be implied from the statute, analogizing J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), because there is no other way to police the use of franking privileges other than by private suit.

I reject completely and totally the majority's conclusion: "None of the present or past statutes relating to the frank specifically grants any private individuals or governmental entities a remedy for injury caused by a congressman's abuse of the privilege. We have found no evidence in the legislative history of the various enactments suggesting that Congress specifically considered the enforcement problem. There is not even a provision equivalent to § 27 of the Securities Exchange Act [15 U.S.C. § 78aa] indicating which courts have jurisdiction to entertain suits involving the statute." (Maj.Op. at 426). (Footnotes omitted).

The quick answer is simply a reference to these statutes: The Postal Service is reimbursed for Congressional franked mailings in the form of "a lump-sum appropriation to the legislative branch . . . , and then paid to the Postal Service as postal revenue." 39 U.S.C. § 3216(a). Reimbursement presupposes either a grant of credit or a payment of moneys; therefore, 39 U.S. C. § 2605 applies. This section provides: "The Postal Service shall request the Attorney General to bring a suit to recover . . . any payment made from moneys of, or credit granted by . . . [it] as a result of . . . mistake . . . [or] fraudulent representations. . . ." "[T]he United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a). Moreover, the Postal Service may "investigate postal offenses and civil matters relating to the Postal Service," 39 U.S.C. 404(7) and may bring suits in law, 39 U.S.C. 409. Unlike the general remedial statute used in *Borak*, 15 U.S.C. § 78aa,[8] the enforcement statutes here are expressly limited. There is no room for implication in these remedial statutes that a private party may avail himself of this avenue of relief: "The Postal Service shall request the Attorney General to bring a suit to recover. . . ." 39 U.S.C. § 2605. "[T]he United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409.

While it may be true, as the majority states that there is "no evidence in the legislative history [of §§ 3210–3212] suggesting that Congress specifically considered the enforcement problem," this proves nothing. Enforcement is allocated to other statutes, to those statutes covering the Postal Service. The majority attempts to disprove point B (legislative history of enforcement of franking laws), instead of disproving point A (Postal Service enforcement), which is the real issue at stake. Logicians call this technique the fallacy of irrelevance, *ignoratio elenchi*.[9]

---

8. The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

9. Sahakian, Ideas of the Great Philosophers, 16 (1966).

### B.

But it is in the factual predicate asserted in the alternate theory which causes me grievous and abiding concern. The theory originates in these statements: "Nevertheless, since 1968 neither the Service nor any other executive department has sought to regulate the use of the frank. The Service's abandonment of its regulatory activities is not surprising. . . . Although . . . the Postal Service may well have the power to enforce the statutes, the plain fact is that since 1968, it has not attempted to do so." (Maj.Op. 427).

If it be true that the Postal Service has not taken steps to enforce, there can be two and only two reasons for inaction: one, that there was not Congressional abuse to merit Postal Service intervention; or two, such abuse did exist, but the Postal Service did nothing about it.

The majority ignores the first possibility completely, and without any supportive evidence in the record, it makes a factual assumption that congressmen did abuse the privilege. The majority then conclude that since the Postal Service has "abandoned" its regulatory activities, the franking statute may be enforced by private attorney general actions "if the intent of the statutes, as expressed by Congress, is to be effectuated."

I refuse to be associated with any assumption that congressmen from 1968 to 1972 abused the franking privilege. Nor do I believe that it is appropriate for the federal judiciary, a correlative branch of the federal government, to proceed from such an assumption and to render a legal conclusion severely critical of Congressional practices.[10]

Even were this assumption legitimate, the conclusion sought to be drawn therefrom, to borrow an idiom from television, "self-destructs." Building from the unsubstantiated hypothesis of Congressional abuse, the argument proceeds to the notion that the Postal Service will not police Congress because "the Service's revenues are in no way depleted by unauthorized use of the frank", and that therefore a private suit is the only remedy. Assuming, without conceding, the validity of the suggestion that there is no harm to the Postal Service because it gets the "lump-sum appropriation to the legislative branch . . . paid to the Postal Service as postal revenue" 39 U. S.C. 3216(a), and that therefore it is officially nonchalant in the presence of abuse by the Congress of the lump-sum appropriation, then the necessary corollary is that there can be only two possible injured parties: either the American taxpayers who foot the bill for the "lump sum appropriation to the legislative branch," or the members of Congress themselves, who may claim a denial of the full use of the legitimate franking privilege fund. Clearly, plaintiff is not a member of Congress. Thus, he sues only as a taxpayer. If he is suing solely in a taxpayer capacity to redeem the loss to taxpayers generally, he lacks standing, as we have heretofore observed, under the analogous doctrine first enunciated in Massachusetts v. Mellon, *supra*, 262 U.S. at 488, 43 S.Ct. at 601: "The party who invokes the power must be able to show, not only that the . . . [practice] is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

In sum, assuming the validity of the premise that the tests of *Data Processing* are applicable—and I have doubts that a "competitor" test may be used in a "taxpayer" context—the subsequent underpinnings of this thesis are extremely fragile, if not evanescent. Put-

---

10. The United States House of Representatives has delegated supervisory powers over franking and postal service to two committees: Committee on Standards of Official Conduct, Subcommittee on Postal Service of the Committee on Post Office and Civil Service. It is significant that the Committee on House Administration, United States House of Representatives, filed a brief amicus curiae in this case urging reversal.

ting aside the demonstration that Schiaffo does not meet the first test of *Data Processing,* even if he had, he was then required to meet the second test of coming "within the zone of interests to be protected \* \* \* by the statute." An attempt is made to meet this by concluding that the only means of enforcement is through the private suit. I have shown how this approach ignores the specific statutes providing for actions by or instituted for the Postal Service. Since the plaintiff is placed in the "zone of interest" only by an inferential process, since these inferences are based on two illicit minor premises—that there is no enforcement commitment in a governmental agency and implied Congressional abuses exist which go unchecked by governmental entities or agencies—the proffered syllogism is analytically unsound; being invalid, it must be rejected.

I find the plaintiff to lack standing. I would reverse the judgment of the district court and dismiss the complaint.